Elmer Wayne HENLEY, Appellant,

v.

STATE of Texas, Appellee.

Nos. 13–81–227–CR, 13–82–290–CR
to 13–82–294–CR.

Court of Appeals of Texas,
Corpus Christi.

Sept. 16, 1982.

Discretionary Review Refused
Dec. 22, 1982.

Duncan Neblett, Jr., Corpus Christi, Will Gray, Simonton, for appellant.

Larry P. Urquhart, Asst. Dist. Atty., John B. Holmes, Jr., Dist. Atty., Carol S. Vance, Houston, for appellee.

Before NYE, C.J., and YOUNG and GONZALEZ, JJ.

## OPINION

GONZALEZ, Judge.

These are appeals from murder convictions by a jury where punishment was assessed at life imprisonment in each cause. At his request, appellant was tried simultaneously by the same jury on six murders that occurred in Harris County in 1972– 1973. The indictments are based on the murders of six young men that had been procured by appellant for homosexual activities. This case was tried in Nueces County on a change of venue. This is a second trial of these cases. Convictions from the first trial in Bexar County were reversed on the basis that the trial court committed error in not allowing an evidentiary hearing on a change of venue motion. *Henley v. State,* 576 S.W.2d 66 (Tex.Cr.App.1979).

The sufficiency of the evidence is not challenged. In eleven grounds of error, appellant alleges that the court committed error in denying appellant's challenge for cause of several jurors who allegedly could not consider the minimum punishment, had formed an opinion as to appellant's guilt which would affect their verdict, and who read newspaper accounts of the trial contrary to the court's instructions. Appellant also alleges error in the court failing to charge on waiver of counsel before the jury could consider the oral statements and the written confession. We affirm.

On August 8, 1973, about 8:15 a.m., appellant called the Pasadana Police Department and reported that he had shot a man. Shortly thereafter, the police arrived and found appellant and two companions sitting down on the sidewalk. Appellant told the officer that the man he had killed was inside the house. There was a pistol lying on the sidewalk near where appellant was seated. The officer placed appellant and his companions in the patrol car and placed the pistol in the truck. The officer went inside the house and found the body of Dean Corll. The officer went back to the patrol car and read the *"Miranda"* warnings to appellant. Appellant blurted out that he didn't care who knew it but he had to get it off his chest and that he knew where there might be some more bodies. Appellant was taken to the police station where he was again warned of his rights by a magistrate. Thereafter, appellant told a detective that he knew the location of some bodies near a warehouse or boat stall. Appellant mentioned the names of Cobble and Jones. The Houston Police Department

was called about whether they had a missing persons record on these persons. They did. Appellant was then taken to the Houston Police Station where he was shown the pictures of Marty Jones and Charles Cobble and appellant verified that these were two people he was talking about. Appellant then led the detectives to the boat stall that had been leased by Dean Corll. From about 6:30 p.m. to 11:30 p.m., the officers dug up a total of eight bodies and discontinued their digging operations. During most of this time, appellant was with the officers.

At approximately 10:00 a.m., the next morning, (August 9th), a detective again warned appellant of his rights. This interrogation resulted in appellant giving a written confession, part of which reads as follows:

"About 3 years ago, I met a guy by the name of Dean Corll. Dean was a lot older than me and a school friend by the name of David Brooks introduced me to him. David was always riding around in Dean's car and everything. I was only about 14 at the time and I thought this was great. David Brooks told me that he could get me in on a xxx deal where I could make some money, and he took me to Dean Corll. Dean told me that he belonged to an organization out of Dallas that bought and sold boys, ran whores and dope and stuff like that. Dean told me that he would pay me $200.00 at least for every boy that I could bring him and maybe more if they were real good looking boys. I didn't try to find any for him until about a year later, and I decided that I could use the money to get better things for my people so one day I went over to Dean's Apt on Schuler street and told him that I would find a boy for him. Dean had a GTX at the time, and we got in it, Dean and me and started driving around. We picked up a boy at 11th and Studewood, and I talked to him since I had long hair and all and it was easier for me to talk to him. I talked him into going to Dean's Apt to smoke some marijuana, so we went over to Dean's Apt.

Dean left some handcuffs laying out where they could be seen, and we had this little deal set up where I would put the handcuffs on and then could get out of them. Then we talked this boy (I don't remember his name) into trying to get out of them. The only thing was we put them on where the locks were turned in where he couldn;t (sic) get the key into them. Then Dean took the boy down and tied his feet and put tape over his mouth. I thought Dean was going to sell him to this organization that he belonged to, so I left. Then the next day, Dean paid me $200.00. Then a day or so later I found out ahat (sic) dean (sic) had killed the boy. Then I found out that Dean screwed him in the ass before killing him. This was the start of the whole thing, and since then, I have helped Dean get 8 or 10 other boys, I don't remember exactly how many. Dean would screw all of them and sometimes suck them and make them suck him. Then he would kill them. I killed several of them myself with Dean's gun and helped him choke some others. Then we would take them and bury them in different places, David Brooks was with us on most of them.

I think the only three that David Brooks wasn't with us on was the last ones at the house on Lamar Street in Pasadena. The ones that I can remember by name are: David Hildegeist who Dean told me that he had killed and buried in his boat stall a boy by the name of Malley Winkle, who David and Dean told they had killed and put in the boat stall *Charles Cobble who I killed and we buried in the boat Stall.* I shot Charles in the head with Dean's pistol, over on Lamar Street in Pasadena, then we buried him in the boat stall. *Then Marty Jones, me and Dean choked him and buried him in the boat stall. We killed a boy by the name of Billy Lawrence,* I dont (sic) remember how we killed him, *but we buried him up at Dean's place on Sam Rayburn Lake.* We killed him at the house on Lamar Street too.Dean told me about one named Rueben Haney that he killed and buried on

the beach at High Island. *I shot and killed Johnny Delone,* and we buried him at High Island. *Then me and Dean and David Brooks killed two brothers,* I think we choked them, anyway, *we buried Billy Balch at High Island,* and *Mike Balch at Rayburn. We choked Mark Scott* and *Frank Aguirre* and *buried them at High Island. The last one that I cna (sic) remember their name is Homer Garcia,* and *I shot him in the head and we buried him at Rayburn.* I don't remember the dates on all these, because there has been too many of them. Some of them were hitch-hikers and I can't remember their names. Dean told me that there was 24 in all, but I wasn't with him on all of them. I tried to tell me (sic) mother two or three times about this stuff and she just wouldn't believe me. I even wrote a confession one time and hid it, hoping that Dean would kill me because the thing was bothering me so bad. I gave the confession to my Mother and told her if I was gone for a certain length of time to turn it in. Me and David talked about killing Dean so that we could get away from this whole thing and several times, I have come within an inch of killing him but I just never got up enough nerve to do it until yesterday, because Dean had told me that his organization would get me if I ever did anything to him. This statement covers all that I can remember about all this killings and all that I know about where they are buried." (emphasis added).

Then appellant led the officers to Lake Sam Rayburn. Enroute, appellant told the officers how they hauled the bodies in a large wooden box in Dean Corll's van. This wooden box was found by the officers in a tool shed in the back of the house where Corll's body was found.

Appellant also told the officers that he shot Cobble in the head and choked Marty Jones but that he couldn't do it all by himself because it was not easy to choke anybody to death like they show on television because he said they just wouldn't die so that he had to call Dean Corll to help

him. In route to Lake Sam Rayburn, the officers stopped in Lufkin and met some other law enforcement officers. Appellant led the officers to a spot in a heavily wooded area on a dirt road. After they had traveled some distance, appellant said "stop I think this is where Billy Lawrence is buried. I think I remember this. This is the big log to the side of the road." The officers got out and marked the spot. Appellant directed the officers to travel about half a mile down the road and he pointed out another gravesite. Appellant did not remember who was buried there.

Appellant related that Dean Corll had bought many sets of handcuffs at several pawn shops in Houston so that nobody would notice him buying an exceptionally large number of handcuffs in one place. He related also an incident with one of the victims, Frank Aguirre. Appellant said that he put the handcuffs on himself but had a key in his back pocket which he used to take the handcuffs off. Then appellant got Frank Aguirre to put them on to see if Aguirre could get them off. After Aguirre had the handcuffs on, appellant and Corll tied him to a board and had oral and anal sex with him before they killed him.

At approximately 10:30 that night, appellant was taken to the San Augustine jail. The next morning, appellant led the officers back to the same wooded area they had been the night before and led the officers to another gravesite. There were two bodies in this gravesite and appellant told the officers that he believed one of the bodies was that of Homer Garcia and he wasn't sure of the other victim's name. They left the area and appellant led the officers to an area on High Island near Winnie, Texas. Appellant told the officers that the bodies were scattered up and down the beach. A total of five bodies were found in this area. In High Island, appellant related to the officers several bizarre acts of torture that the victims were put through before they were killed.

### Jury Selection

Appellant's first eight grounds of error relate to alleged harmful errors committed

during selection of the jury. The record reflects that appellant used ten of his peremptory challenges on veniremen Juranek, La Fon, Maresh, Segura, Vaughn, Miles, Hodges, Alexander, Ullom, and Reyes, after his challenge for cause to each of these persons was overruled. The record shows that appellant requested a sufficient number of additional peremptory challenges to cover the ten jurors but was given only two. Therefore, if the trial court ruled incorrectly on more than two of these challenges, reversal will be required. The record also shows that appellant informed the trial court that because it granted an insufficient number of additional peremptory challenges, eight jurors were seated on the jury that were objectionable to him and that he would have excused by peremptory challenge. The adverse rulings of the trial court to appellant's challenges for cause have been correctly brought forward for review. See, *Pierce v. State,* 604 S.W.2d 185 (Tex.Cr.App.1980).

■ In deciding the propriety of the court's ruling on challenges for cause during voir dire, we must take into consideration the totality of the juror's responses concerning the qualification in question.[1] This includes taking into consideration such factors as the nature of the question put to the juror,[2] the juror's ability to comprehend the question and the juror's ability to express himself. We must also weigh vague or contradictory responses against those that are not,[3] keeping in mind, in close cases, that the trial judge has had the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended, while we only have the "cold record".[4]

In his first ground of error, appellant argues that veniremen Juranek, La Fon, Maresh, and Segura should have been excluded on the grounds that none of them could consider the "minimum punishment of five years probation in a murder with malice case." Art. 35.16(c)(2), V.A.C.C.P., provides in pertinent part:

"(c) A challenge for cause may be made by the defense for any of the following reasons:

(1) . . .

(2) That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense of which the defendant is being prosecuted or as a mitigation thereof *or of the punishment therefor.*" (emphasis supplied).

■ In overruling the challenge for cause to each of these jurors, the trial court impliedly found that each of these jurors would follow the probation law and that each was willing to leave open the possibility of applying that law until all of the evidence had been presented. See, *Woodkins v. State,* 542 S.W.2d 855 (Tex.Cr.App. 1976).

From the totality of the juror's responses, we hold that the trial court's finding that each of these jurors was willing to leave open the full range of punishment until all the evidence had been presented is supported by the record. Appellant's first ground of error is overruled.[5]

In his second ground of error, appellant contends that the trial court erred in denying his challenge for cause to jurors Vaughn and Miles on the ground that they had established in their mind a conclusion

1. *Pierce v. State, supra* at 187; *Vigneault v. State,* 600 S.W.2d 318, 326 (Tex.Cr.App.1980).

2. *Porter v. State,* 623 S.W.2d 374, 377 (Tex.Cr. App.1981); *Vigneault v. State, supra,* at 326.

3. *Porter v. State, supra; Williams v. State,* 622 S.W.2d 116, 119 (Tex.Cr.App.1981); *Pierce v. State, supra; Vigneault v. State, supra; Simmons v. State,* 594 S.W.2d 760, 764 (Tex.Cr.

App.1980); *O'Bryan v. State,* 591 S.W.2d 464, 471 (Tex.Cr.App.1979).

4. *Tezeno v. State,* 484 S.W.2d 374, 383 (Tex.Cr. App.1972).

5. 25 pages of pertinent voir dire for all of grounds of error regarding jury selection was attached to the opinion in an unpublished appendix.

that appellant was guilty and that such conclusion would affect their verdict.

■ Appellant also contends that the trial court committed error during the voir dire examination of Vaughn and Miles when the trial court refused under Article 35.16(a)(9), Texas Code of Criminal Procedure, to terminate the questioning. The pertinent part of that Article provides:

"A jury challenge for cause may be made by either the state or the defense for any one of the following reasons:

(9) That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court. If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; . . ."

If the statute were followed precisely, the trial court and the parties would first determine whether the juror had a conclusion concerning the guilt of the defendant. If it were determined that such conclusion existed, the trial court would then ask the juror specifically whether in the juror's opinion the conclusion would influence his verdict. An affirmative answer would terminate the inquiry and a negative answer would permit the examination to continue.

■ In this case the examination was not regimented in this fashion, making it difficult if not impossible to correctly employ the termination provision. Questions concerning the existence of conclusions of guilt and questions concerning what influences those conclusions might have on reaching a verdict were intermixed. We hold that the appellant by the general and vague manner in which he conducted this voir dire, i.e.: mixing questions of conclu-

sions of guilt with questions of how the conclusions would affect the verdict waived the right to invoke the termination provisions of Article 35.16(a)(9), *supra*. Furthermore, the question is not whether a juror "had a thought or suspicion," that he (appellant) was somewhat involved and whether this "thought or suspicion" would affect his verdict. The question is *conclusion of guilt or innocence*. When asked this question, the juror said he did not. At best, jurors Miles and Vaughn were equivocating jurors. This is one of the reasons appellant was given the right to strike twelve jurors without assigning any cause.

■ Even if appellant did not waive the termination provision of 35.16(a)(9), *supra*, under the totality of the circumstances, it was not established that Vaughn and Miles had a conclusion as to the guilt or innocence of appellant. Furthermore, if it was error for the court to deny the challenge, it was rendered harmless by the court giving appellant two more peremptory challenges than he was legally entitled.

■ Appellant also contends that the trial court erred in denying his challenge for cause to jurors Hodges, Vaughn, and Segura on the ground that they could not "consider evidence that defendant had acted under duress or the domination of an older person in mitigation of punishment contrary to . . . Article 35.16(c)(2) Tex.Code Crim.Pro. (Supp.1981)." Article 35.16(c)(2) of the Texas Code of Criminal Procedure in pertinent part provides:

"(c) A challenge for cause may be made by the defense for any of the following reasons: . . .

(2) That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefore."

Specifically, appellant argues that these jurors would not consider evidence of duress in mitigation of punishment. Appellant does not cite and we cannot find any

law which authorizes a lesser punishment upon a finding of duress or domination by an older person. Duress is an absolute defense, not a matter of mitigation of punishment. Tex.Penal Code § 8.05 (Supp.1981).

 Segura was also challenged on the ground that he could not consider "rehabilitation" in deciding punishment. Rehabilitation is only one purpose of punishment. Other purposes are restitution, retribution and separation of a bad actor from society. A juror who is unwilling to consider the rehabilitative purposes of punishment is not subject to challenge for cause. Appellant's second, third and fourth grounds of error are overruled.

 In the fifth ground of error, appellant contends that the trial court erred in denying his challenge for cause against Juror Alexander on the ground that Alexander would consider the indictment as evidence of guilt in violation of Article 38.03, Texas Code of Criminal Procedure which provides that the fact that a person has been indicted for an offense gives rise to no inference of guilt at the trial. We hold that from the totality of the juror's responses, the trial court's implied finding that Alexander would not act in violation of this statute is supported by the record. Appellant's fifth ground of error is overruled. *Camacho v. State,* 156 Tex.Cr.R. 1551, 244 S.W.2d 823 (1952).

In his sixth ground of error, appellant contends that the trial court erred in denying his challenge for cause to Juror Ullom on the ground that he could not be impartial because he was worried that his jury service would cause him to lose his job. Appellant did not cite any authority.

 Jury service is a privilege and a civic duty. However, the trial court has discretion to excuse veniremen for cause on grounds that are not enumerated in the Texas Code of Criminal Procedure Article 35.16. *Moore v. State,* 542 S.W.2d 664, 669 (Tex.Cr.App.1976). In *Moore* it was held that it was not error for the court to excuse a venireman who was going to be so preoc-

cupied by personal problems that he could not be fair. However, Ullom stated that "even though he wouldn't like it" he could give both sides a "fair trial" and that his worries "wouldn't detract from the case." He did say that his concerns were speculative, would "affect his deliberations" but it was never developed by the question exactly how his deliberations would be affected. We hold that the trial court did not abuse its discretion in refusing to excuse Juror Ullom for cause. Appellant's sixth ground of error is overruled.

 In ground of error seven, appellant contends that the trial court erred in denying his challenge for cause to Juror Reyes on the ground that she read a newspaper article about the case after she was selected as one of the veniremen and after being instructed by the court not to read about the case. While Reyes' conduct may have been contempt of court, it was not grounds for excusing her for cause without a showing that from reading the article she had formed an opinion or conclusion about the guilt or innocence of the appellant that would affect her verdict. No showing of this kind was made. We, therefore, hold that the trial court did not abuse its discretion in refusing to excuse Juror Reyes for cause.

In ground of error eight, appellant contends that the trial court erred in refusing to grant a mistrial when Juror Barrera revealed that after his voir dire examination and before being seated on the jury he had read two newspaper articles about the case. Barrera voluntarily brought the matter to the court's attention explaining that when he read the articles he thought he had not been selected to serve on the jury. Barrera told the court that the articles would not have any influence on him as a juror and would not help him in arriving at a decision as to the guilt of appellant.

 The reading of media accounts of the trial by a seated juror after being instructed not to do so is not grounds for a mistrial unless it be shown that the accused was injured or prejudiced by such conduct.

*Broussard v. State,* 505 S.W.2d 282, 284 (Tex.Cr.App.1974). No prejudice or injury is shown by this record. We, therefore, hold that the trial court acted correctly in refusing to grant appellant's motion for mistrial. Appellant's eighth ground of error is overruled.

### Oral & Written Confessions

In grounds of error nine, ten and eleven, appellant contends that the issue of knowing waiver of counsel was raised by the evidence after the confession had been admitted into evidence and, therefore, it was error for the court to fail to charge the jury that they first had to find that appellant had knowingly, voluntarily, and intelligently waived his right to counsel before his oral and written confessions could be considered by them against him.

It is necessary to review the chronology of the events of this case to properly analyze appellant's contention.

On August 8, 1973, after killing his partner in crime, Dean Corll, appellant called the police and advised them of this fact. The first officer to arrive at the scene was Officer Jamison. Officer Jamison read appellant his rights and appellant appeared to understand them. Shortly thereafter, appellant blurted out that "he didn't care of who knew it, he just had to get it off his chest. He knew where there might be some more bodies." Appellant was then taken to the police station where he was again given his rights by Judge Drake in compliance with Art. 15.17 of the Texas Code of Criminal Procedure. Appellant indicated to Judge Drake that he understood what his rights were.

The next morning on August 9, Officer Mullican again warned appellant of his rights and appellant acknowledged that he understood what his rights were. Appellant did not ask to have a lawyer appointed nor to have the interview terminated but proceeded to give a written confession. The warning and waiver at the top of the confession was read to appellant while appellant read it from another form. This confession in pertinent part reads as follows:

"On the 8th day of August, 1973, at 10:55 o'clock A.M., I Elmer Wayne Henley, was taken before Judge Russell Drake, a Magistrate at his office Pasadena, Harris County, Harris County, Texas, who informed me:

Of the accusations made against me;

That I had a right to retain counsel;

That I had a right to remain silent;

That I had a right to have an attorney present during my interview with peace officer or attorneys representing the state;

That I have a right to terminate an interview at any time;

That I have a right to request appointment of counsel if I cannot afford counsel;

That I have a right to an examining trial;

That I am not required to make any statement, and any statement I make may be used against me.

I have now been warned by <u>Detective D.M.Mullican</u>, the person to whom I am making this statement, and was so warned by <u>Detective D.M.Mullican</u> prior to any questioning of me by police while I was under arrest:

(1) that I have the right to have a lawyer present to advise me either prior to any questioning or during any questioning; (2) that if I am unable to employ a lawyer I have the right to have a lawyer appointed to counsel with me prior to or during any questioning; and (3) I have the right to remain silent and not make any statement at all and that any statement I make may and probably will be used in evidence against me at my trial, and (4) I have the right to terminate the interview at any time.

I do not want to consult with a lawyer before I make this statement, and I do not want to remain silent, and I now freely and voluntarily waive my right to a lawyer and to remain silent and make the following voluntary statement.

XXX My name is Elmer Wayne Henley, I am a white male 17 years old and

was born on 5–9–56 in Houston, Texas. I have completed the 8th grade in school and can read and write the English Language. I presently live with my Mother at . . . ."

Officer Mullican asked appellant if he understood his rights and appellant acknowledged that he did.

After the confession was completed, appellant was taken to the Houston Police Station. He visited with his mother and then directed the officers to San Augustine and the Lake Sam Rayburn area where other victims had been buried. During this trip, appellant made numerous incriminating oral statements, many of them relating to the methods of torture used on the victims.

At the hearing on the motion to suppress the confession and oral statements, nothing was said about anything that remotely indicated that appellant wanted a lawyer. The court found the statement admissible. At the trial, after the court had admitted these oral statements and the confession, in front of the jury, on cross-examination of Officer Mullican, about the trip to San Augustine on August 9, Officer Mullican testified that appellant "had already told [him] on the way up there that he was familiar with [attorney] Plotkin. He had done some work for his mother. He did not want Plotkin because he didn't want his mother to have to pay." Appellant did not testify at his trial nor present any evidence that he did not understand his rights. However, appellant argues that the statement regarding Plotkin raised an issue of appellant's understanding of his rights and, therefore, it was

error for the court not to charge the jury that they first had to find that appellant waived his right to counsel before they could consider them against him. We do not agree that the issue of knowing waiver of counsel was raised by the evidence.

■ Before making this statement concerning Plotkin, appellant had been advised of his *Miranda* rights on four separate occasions. On each occasion, appellant acknowledged that he understood them. Appellant never indicated that he desired to consult an attorney. To the contrary, he wanted to get matters "off his chest" and willingly cooperated with the officers from the very beginning after he had been warned of his rights. Appellant does not challenge the adequacy of the warnings.

From the totality of the circumstances, we hold that appellant's statement concerning Mr. Plotkin *did not* raise an issue that he did not understand his rights to counsel. The trial court therefore did not err in refusing to instruct the jury on the issue of knowing waiver. Appellant's ground of error nine, ten and eleven are overruled.

The judgments in cause numbers 79–CR–256–E, 79–CR–257–E, 79–CR–258–E, 79–CR–259–E, 79–CR–260–E and 79–CR–261–E in the 148th District Court of Nueces County, Texas are affirmed.