**Fernando GARCIA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70993.**

Court of Criminal Appeals of Texas, En Banc.

April 13, 1994.

Rehearing Denied Sept. 21, 1994.

E. Brice Cunningham (on appeal only), Dallas, for appellant.

John Vance, Dist. Atty., A. Wetherholt, A. Beach, D. Jones and J. Little, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

McCORMICK, Presiding Judge.

Appellant was found guilty of murder while in the course of committing or attempt-

**849**

ing to commit aggravated sexual assault. V.T.C.A., Penal Code, Section 19.03(a)(2). After the jury answered the two special issues in the affirmative the trial court assessed punishment at death. Article 37.071, V.A.C.C.P. Direct review by this Court is automatic. Article 37.071(h), V.A.C.C.P. Appellant raises twenty-six points of error, but does not challenge the sufficiency of the evidence at either stage of trial. We will affirm appellant's conviction.

In points of error nine through fifteen, appellant contends that the trial court erred in failing to suppress evidence[1] obtained from three separate searches of appellant's residence[2] in violation of the United States and Texas Constitutions and the Texas Code of Criminal Procedure.[3] In order to address these points, we will first review the pertinent facts.

The victim, three-year-old Veronica Rodriguez, was discovered missing sometime around 2:00 a.m. on Sunday, August 30, 1987, when her mother, Debbie Rodriguez, returned from an evening out with friends. After Rodriguez and Martin Barbosa[4] looked unsuccessfully around the house, they went out to the garage apartment where appellant lived and asked if he had seen the child. Appellant replied that he had not, but would help them look for her. Before the three of them left to continue the search, appellant padlocked the garage. Several hours later, the police were called. Officer Patrick Burke of the Dallas Police Department was dispatched to the residence at about 11:20 a.m.

---

1. We are defining "evidence" here to include all tangible evidence, photographs, statements made and acts committed by appellant, and testimony of law enforcement.

2. The first search was conducted on Sunday, August 30, the day the police were originally called. The second was on Monday, August 31, when police returned for a follow-up investigation. Approximately two weeks later when more evidence was discovered in appellant's garage apartment, police were called and conducted a third search.

3. Specifically, he asserts violations of:
 "... THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS 9, 10 AND 19 OF THE TEXAS CONSTITUTION AND ARTICLES 13.01–18.29 [sic]; 14.01–14.06, 1.05 AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE."
 Since appellant makes no distinctions between federal and state law, there is no need to address his state constitutional claims separately. See *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App. 1991); *McCambridge v. State*, 778 S.W.2d 70 (Tex.Cr.App.1989).

4. Rodriguez testified that she and her two children were living with Barbosa, her fiance at the time of the offense.

on Sunday, August 30, 1987, to investigate the victim's disappearance. When Burke arrived he spoke with Rodriguez and Barbosa. He saw appellant standing on the porch of the residence with two other men and, shortly thereafter, noticed appellant walk off in an easterly direction. Burke conducted a walk-through search of the house and then proceeded to a nearby store to call his superiors. Since the case involved a child under ten years of age, an officer was assigned to the case until Veronica was found.

Around 1:30 to 2:00 p.m., another patrol officer and Royce Dickey, a youth investigator, arrived at the home. By this time Burke had conducted a thorough search of the house and canvassed the neighborhood, but still had not found the missing child. At this point, the officers expressed a need to look into the garage behind the house to determine whether the child might have entered the structure somehow and possibly been hurt. Barbosa told the officers that he owned both the house and the garage and that he had an agreement with appellant that he could enter the garage whenever he wanted because he kept some of his own property there.[5] Barbosa then consented to the officers' search of the garage. However, when he attempted to unlock the garage door, Barbosa found that his key did not fit the padlock so he proceeded to break the door open. The officers conducted a cursory search of the garage including the inside of a refrigerator.[6] Not finding anything on this initial search, Barbosa and the police exited the garage and continued the search elsewhere.

The youth division investigator, Dickey, returned to the residence the next morning,

Monday, August 31, and asked Barbosa if he could search the garage. Again Barbosa gave his consent. The garage had remained open since the previous day when Barbosa had broken the lock. Appellant had not been seen since the previous day when he allegedly agreed to aid in the search. When Dickey opened the garage door to initiate the second search, he smelled a familiar odor, leading him to believe a dead body was somewhere inside. On further investigation, Dickey found the body of the missing child wrapped in a blanket under appellant's bed next to a wall of the garage. She had been sexually assaulted, beaten, and strangled. Other officers were then called to the scene to collect evidence. Several of the complained of items were gathered at this time or obtained subsequently as a direct result of further investigation.[7]

Barbosa testified that appellant had moved into his home in early 1987 and rented a back room. Approximately a month before this offense, Barbosa and appellant had converted the garage into a one room apartment into which appellant then moved. Appellant had his own television, bed, and clothes in the garage apartment, plus a refrigerator which Barbosa had put there for him. However, since the garage had no running water or toilet facilities, appellant had Barbosa's permission to use the facilities inside the main house when necessary. Barbosa further testified, with no contradiction, that he still kept some of his personal belongings out in the garage and had an agreement with appellant that he could enter the garage whenever he desired. Both Barbosa and appellant were supposed to have keys to the padlock on the garage.

The trial exhibits reveal that, upon entering the garage, a person would find himself

---

5. The record reflects that this was actually the house of Barbosa's parents who resided elsewhere; however, Barbosa had lived there all his life and was unquestionably the one presently in control of the property.

6. At this time, the officers were looking for a live child who might be hiding or injured. According to Burke, children sometimes hid inside refrigerators and became trapped.

7. Specifically, the items appellant complains were illegally recovered in this search are a

pillow, a pillow-case, a cut-away portion of the mattress cover/box springs, a blanket, a towel, a photograph of the deceased child on a striped sheet and the striped sheet, a diagram of the deceased's injuries, photographs of the deceased taken prior to autopsy showing bite marks and bruises, photographs of the striped sheet, and a Life Codes Corporation receipt of samples for DNA testing.

in a single large room around which was scattered various pieces of furniture and other items. There were no apparent room dividers or anything else to indicate that one section of the garage was any more private than another. The remaining complained of evidence was discovered approximately two weeks after the victim's body was found when Barbosa, his sister, and her friend were in the garage.[8] It was apparent that appellant had not returned since August 30 when the officer saw him walk away.

Appellant contends that each of the three searches of the garage apartment was illegal because no search warrant was obtained. Hence, he asserts that admission in trial of evidence obtained pursuant to these searches violated his constitutional rights. Barbosa conceded on the witness stand that he had not gone into the garage since appellant had moved into it and, therefore, appellant argues that Barbosa did not have authority to consent to its search. However, whether Barbosa had or had not been in the garage within a certain period of time is not dispositive of whether or not he could give valid consent.

■ The United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. It is well settled under the Fourth and Fourteenth Amendments that a search without a warrant based upon probable cause is "per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *Kolb v. State,* 532 S.W.2d 87 (Tex.Cr.App.1976); *Juarez v. State,* 758 S.W.2d 772 (Tex.Cr.App.1988). One of the established exceptions to the warrant and probable cause requirements is a search that is conducted pursuant to consent. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Kolb,*

supra; *Juarez,* supra. A third party may properly consent to a search when he has control over and authority to use the premises being searched. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Becknell v. State,* 720 S.W.2d 526, 528 (Tex.Cr.App.1986), cert. denied, 481 U.S. 1065, 107 S.Ct. 2455, 95 L.Ed.2d 865 (1987). Appellant asserts that the oral agreement was breached when he changed the lock on the garage door; hence, appellant contends Barbosa could not give valid consent to search the garage. We disagree.

■ We first note that this Court continues to adhere to the rule that a landlord cannot generally give effective consent to allow a search of a tenant's premises. *McNairy v. State,* 835 S.W.2d 101 (Tex.Cr. App.1991). See *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). In *Becknell,* the parents of the adult defendant gave police permission to enter and search his locked room, which they never entered unless the defendant was present. The defendant had the only key to the lock to the door for the last two to three years he had resided there, and cooked and ate his meals apart from the rest of the family. This Court held the third party consent was invalid because the defendant's father did not exercise equal control over and equal use of the premises being searched. *Id.,* 720 S.W.2d at 528.

The facts of the instant case are distinguishable from those in *Becknell,* in which it was clear that only the defendant had control over his locked room. Although Barbosa may not have recently entered the garage to obtain property, the evidence is clear that he had an express oral agreement[9] with appellant that he could enter whenever he wished and that he could continue to use the premises by storing his property inside. There was no evidence that this agreement was limited

---

8. Specifically, this evidence consists of a photograph which depicts both the inside of the garage and a paper sack that was found there and a second photograph showing a close-up of the paper sack.

9. We further note that the entire lease was oral in nature.

in scope or duration. Because of the uncontroverted testimony that both Barbosa and appellant had equal access to the garage apartment, Barbosa had authority to consent to the search. Simply because appellant had replaced the lock sometime during the month that he had been living there did not negate or breach the oral agreement so as to render it invalid. Barbosa's consent was just as effective when he gave it to officers on August 30, 1987, as it would have been before he knew the lock had been changed. Under the circumstances, there was no reason for police to believe that Barbosa did not have authority to enter the garage and/or the authority to consent to its search.

Considering all attendant circumstances in this case, we hold that Barbosa had control over and authority to use the garage and could, therefore, give valid consent to the officers for the initial search as well as the subsequent searches of the structure. See *Becknell*, supra. Hence, any evidence the police obtained as a result of these searches was properly obtained and the trial court did not err in overruling appellant's motion to suppress. Points of error numbers nine through fifteen are overruled.

■ In points of error sixteen through twenty-six, appellant alleges trial error in the denying of defense counsel's challenges for cause,[10] thereby forcing appellant to accept an objectionable juror after exercising all his peremptory strikes.[11] When the trial court errs in overruling such a challenge against a venireperson, the defendant is harmed only if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of the strike. *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Cr. App.1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). Error is preserved only if appellant used all his peremptory strikes, asked for and was refused additional peremptory strikes, and was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes so that he might strike the juror. *Adanandus v. State*, 866 S.W.2d 210, 220 (Tex.Cr.App.1993); *Satterwhite v. State*, 858 S.W.2d 412, (Tex.Cr.App.1993); *Demouchette*, 731 S.W.2d at 83; see *Trevino v. State*, 815 S.W.2d 592, 611 at n. 5 (Tex.Cr. App.1991). The record reflects that appellant had used all fifteen of his peremptory strikes by the time the eleventh juror was seated. After three more potential jurors were questioned, appellant requested and received two additional peremptory strikes which he used on two of the three. He then requested another peremptory strike with which he would have struck the third; however, the trial court denied his request and the juror was seated. Appellant claimed, without explanation, that this juror was objectionable. Hence, appellant has preserved these issues for our review.[12]

■ In points of error numbers sixteen through eighteen, appellant alleges that the court erred in denying his challenges for cause of venirepersons Larry Zimmerman, Robert Stephen Hampton, and Patrick J. Seyster, because of their failure to understand and articulate a distinction between the

---

10. Article 35.16(c), V.A.C.C.P., sets forth the reasons for which the defense may make a challenge for cause. Our concern lies with (c)(2), that the venireperson:

"... has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor."

11. While only six veniremembers were challenged, appellant alleges ten different grounds on which he maintains the challenges should have been granted.

12. Since appellant was granted two additional peremptory strikes, he did not suffer the loss of two strikes. Therefore, for appellant to demonstrate harm and, hence, reversible error, he must show that challenges for cause on at least three different veniremembers were erroneously denied. *Martinez v. State*, 763 S.W.2d 413, 425 (Tex.Cr.App.1988); *Henley v. State*, 644 S.W.2d 950 (Tex.App.—Corpus Christi 1982, pet. ref'd).

words "intentionally" and "deliberately."[13] Thus, appellant contends that each venireperson was biased against the law upon which appellant was entitled to rely. The record does not support this contention in any of the three cases.

When venireperson Zimmerman was originally asked by the prosecutor whether he saw a distinction between the two terms, he stated that he did, although admittedly, it was only a small one. However, he also stated that the comments being made during voir dire had shown him other possibilities. During questioning by the prosecutor, Zimmerman testified as follows:

"Q. Can you tell us and, more importantly, tell the Judge that you recognize the distinction between the word intentional and deliberate, and you will make the word deliberate mean something more than the word intentional?

"A. Yes, I can say that.

* * * * * *

"A. Yeah. I'm not sure I can say that there's a vast difference between intentional and deliberate right now. I'm not saying that at all. I'm saying that I recognize there's some difference. How much, I don't know right now.

"Q. It would depend upon the facts of the case?

"A. I would say so.

* * * * * *

"Q. So I guess the bottom line is this: Let me just ask you again. Can you see that just because you found someone guilty of the intentional killing of someone, it does not necessarily mean that he did it deliberately, too? May have?

"A. Yeah. I can see that. Yes. Yes."

When Zimmerman was questioned by appellant, he appeared to be confused by counsel's questions:

"Q. My question is: Do you as an individual feel that there's a difference between intentionally and deliberately, or do you thing it's a meaningless distinction?

"A. In my mind, it's—they're one and the same in my usage."

Ultimately, when asked by the trial court whether he could make a distinction between the two, Zimmerman responded affirmatively.

Similarly, Hampton, upon questioning by the State, indicated that he understood the definition of intentional. The following then occurred:

"Q. ... They're asking you did he go further or higher, did he do it deliberately. A lot of people have trouble understanding that concept ... but in order to be a qualified juror you've got to be able to tell us that you understand that distinction and that you can make the word deliberately mean something more than the word intentionally?

* * * * * *

"That's a long way of me putting it for me to come around and ask you this question: Can you do that?

"A. Sure, I can do that.

* * * * * *

"Q. So as long as you can tell us you understand the distinction between those words and you can make the word deliberately mean something more than the word intentionally.... Can you do that?

"A. I can do that."

Thus, it appeared that Hampton did discern a difference between the two terms. However, after counsel for appellant explained that there was really no definition of deliberately, Hampton also appeared confused, viz:

"Q. Now there's really no definition of deliberate. Can you tell me what you

<hr/>

13. The term "intentional" refers to the culpable mental state of the crime and is defined in V.T.C.A., Penal Code, Section 6.03(a). The term "deliberate" is codified in the first punishment issue of Article 37.071(b)(1), V.A.C.C.P., and has not been defined by the Legislature.

[sic] deliberate means as we are using it in this courtroom?

"A. No, I can't.

\* \* \* \* \* \*

"Q. Before you came down to this court-room—courthouse on this jury summons, would you say that you would have assumed or had thought deliberate and intentional were synonyms and meant the same thing?

"A. I guess I did, yes."

Although Hampton did appear to be initially confused by counsel's questioning, upon further examination by the court, he indicated that he did understand the difference. He also responded affirmatively when the court asked whether he would answer "yes" to the special issues only if the evidence presented supported an affirmative finding beyond a reasonable doubt.

Finally, venireperson Seyster, upon questioning by the State, indicated that he discerned a difference between the two. After the prosecutor explained that intentional, deliberate, and premeditated did not mean the same thing, Seyster indicated that he understood the difference in the terms. The following colloquy transpired:

"Q. Now, as you sit there, don't think that you have to come up with a definition of the word deliberately.

\* \* \* \* \* \*

Whenever you get to question No. 1 up here, the import of it is, did he do it deliberately.... Now, you're being asked something different, that is did he do it deliberately, not intentionally. Did he go further? Did he go higher? Did he do it deliberately? Does that make any sense to you?

"A. Yeah, it does."

Like Zimmerman and Hampton, upon questioning by defense counsel, Seyster admitted he thought the two definitions were very close, but his determination of deliber-ately would depend on the facts of the case. At times, he did appear confused by counsel's questions and hypotheticals posed. Seyster stated:

"A. You just got to look at what's in front of you and go from there and make the best judgment you can.... It's—it's a little difficult to make it without something to base the idea of the two against.

\* \* \* \* \* \*

There's bound to be a little difference between the two words or we wouldn't need the same damn two words. There's bound to be some kind of reason.

\* \* \* \* \* \*

"Q. ... And in our particular situation, there's got to be a difference between deliberate and intentional.

\* \* \* \* \* \*

Can you see a difference then?

"A. I can see it as how it is wrote in this piece of paper."

Seyster was able to discern a difference between intentionally and deliberately, but was unable to specifically articulate it.

 With respect to each of these potential jurors, the question of whether appellant's challenges were wrongfully denied by the trial court is subject to an abuse of discretion standard. *Adanandus,* supra, 866 S.W.2d at 222; *Mooney v. State,* 817 S.W.2d 693 (Tex.Cr.App.1991). The propriety of the trial court's rulings will be reviewed in light of the venireperson's voir dire as a whole. *Satterwhite,* supra, citing *Holland v. State,* 761 S.W.2d 307 (Tex.Cr.App.1988), and *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). When faced with a vacillating or equivocal venireperson, this Court will accord great deference to the trial judge, who had the better opportunity to see and hear the person. *Adanandus,* supra; *Green v. State,* 840 S.W.2d 394, 405 (Tex.Cr.App.1992), cert. de-

nied, —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993), citing *Perillo v. State*, 758 S.W.2d 567, 576–77 (Tex.Cr.App.1988); *Mooney*, supra at 701. If a venireperson states she will answer the first special issue based on the law and the evidence presented rather than as an automatic response to the guilty verdict, she is not subject to a challenge for cause even if she cannot conceive of a situation in which she would answer the first special issue in the negative. *Mooney*, supra; *Pierce v. State*, 777 S.W.2d 399, 412 (Tex.Cr.App.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990).

We hold Zimmerman, Hampton, and Seyster were all vacillating veniremen. Each initially indicated that he understood the difference between the two terms, but equivocated when questioned by appellant. However, as each also ultimately indicated that he did comprehend a difference, he was not challengeable for cause, even though he originally equivocated on his answers. *Adanandus*, supra, 866 S.W.2d at 222; *Satterwhite*, supra.

Appellant fails to demonstrate that the trial court abused its discretion in refusing to grant his challenge for cause to venirepersons Zimmerman, Hampton or Seyster. After reviewing the entire voir dire testimony of each of the above three venirepersons, we find no error in the trial court's denial of appellant's challenges for cause. Points sixteen through eighteen are overruled.

■ In point of error nineteen appellant alleges that the trial court erred in overruling the challenge for cause to venireperson Seyster "based upon his testimony that he would always answer Special Issue No. 1 'yes' if he found the accused guilty of intentionally causing the death of another person beyond a reasonable doubt." Appellant makes this allegation out of context. In discussing the distinction between the terms "intentionally" and "deliberately," appellant poses the hypothetical of an intentional murder as it relates to fragments of the first special issue.[14] Specifically, the following exchange occurred during questioning by the defense:

"Q. So you find me guilty of capital murder.

Then you're called upon to answer question No. 1. Let's take No. 1 from the bottom rather than the top. Let's start with reasonable expectation that the death of the deceased would result.

\* \* \* \* \* \*

If you found that I have intentionally with specific intent killed somebody, wouldn't you find invariably that I would reasonably expect that the death would result? If you had already found that I had intentionally killed them, would you not always find that, of course, I reasonably expected the death would result?

"A. Makes sense."

It also makes sense to this Court that if a person intentionally kills someone, that person reasonably expects death to result; however, in this context, whether that killing was also committed deliberately is still in question. It cannot be inferred, from this ambiguous series of questions, that this venireperson would always answer the first question, in its entirety, in the affirmative. Also, we have already determined that Seyster did discern a difference between intentional and deliberate.[15] Given the context, this point of error does not fall within the ambit of cases like *Cumbo v. State*, 760 S.W.2d 251, 254 (Tex.Cr.App.1988), in which the venireperson

---

14. At the time of trial, the first special issue read as follows:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Article 37.071(b)(1), V.A.C.C.P.

15. Appellant's reliance on *Martinez v. State*, 763 S.W.2d 413 (Tex.Cr.App.1988), is misplaced. There the prosecutor relied on a faulty hypothetical in order to attempt to distinguish between intentional and deliberate, and her error was reiterated by the trial court in its attempt to rehabilitate two potential jurors, in effect, producing veniremen biased against the law.

stated that he thought that every person convicted should receive the death penalty without exception. We hold the trial court did not abuse its discretion in overruling appellant's challenge for cause as to this venireperson. Point of error number nineteen is overruled.

In points of error numbers twenty and twenty-one, appellant contends that the trial court erred in overruling his challenges for cause to venirepersons Ronald G. Newman and Robert Stephen Hampton [16] on the grounds that they could not consider inmates in the Texas Department of Corrections [17] as a part of "society." See *Rougeau v. State,* 738 S.W.2d 651, 659–661 (Tex.Cr.App.1987), *overruled on other grounds,* 784 S.W.2d 5 (Tex.Cr.App.1989). The record supports neither of these contentions. The testimony of Newman reveals that, when asked by the prosecutor whether he could consider said inmates as part of society, Newman stated that he could. Upon questioning by appellant, Newman did not contradict himself.

In responding to questions from the State, Hampton indicated that he, also, would consider inmates as part of society although in his case it was obvious that he had not thought about inmates in that context before. When subsequently questioned by appellant, Hampton equivocated and said that he would "have a hard time" considering inmates as being part of society. Ultimately, after the trial court explained that "the word society, if the person is going to be institutionalized for the rest of his natural life, the only society with whom he will be interfaced with are those individuals behind the institutions [sic] parameters, inmates, personnel of the Texas Department of Corrections," Hampton stated that he could accept the word as the court had explained it to him. We find no abuse of discretion in either case. Points of error numbers twenty and twenty-one are overruled.

In point of error number twenty-two, appellant asserts that prospective juror Newman should have been excused for cause "because of his responses to questions concerning consideration of mitigating evidence." He contends that the unequivocal denial to consider certain evidence as mitigating amounts to a bias against the law on which he is entitled to rely. Article 35.16(c)(2), supra. Initially, we note this Court has already addressed this specific issue. In *Cuevas v. State,* 742 S.W.2d 331, 346 (Tex.Cr.App.1987), we opined:

"[T]he trier of fact must not be precluded from considering any relevant mitigating evidence in answering the special issues. However, the cases do *not* mandate that the trier of fact must give any specified weight to a particular piece of evidence. [citation omitted]. 'The amount of weight that the fact-finder might give any particular piece of mitigating evidence is left to "the range of judgment and discretion exercised by each juror." ' " [citations omitted].

"The law only requires that the defendant be permitted to introduce relevant mitigating evidence. Contrary to appellant's contention, the law does not require the jurors to consider his two hypothetical factors as mitigating." (emphasis in original).

See also *Allridge v. State,* 850 S.W.2d 471 (Tex.Cr.App.1991).

The record reveals that Newman stated he would not consider age and intoxication as "an excuse" for the commission of the offense. The record also shows that the venireperson had not been instructed as to any law on this issue at the time that he made these statements. In order for a venireperson to be excusable for cause, appellant must show that he has a bias against the law. The only law of which the venireperson was informed was the following misstatement of

---

**16.** This is the same veniremember who is the subject of point of error number seventeen.

**17.** Now the Texas Department of Criminal Justice, Institutional Division.

V.T.C.A., Penal Code, Section 8.04 [18] made by the court:

"[L]et me read to you a section of the Penal Code of the State of Texas. Specifically, Section 8.04.

\* \* \* \* \* \*

"Voluntary intoxication is not a defense to any offense.

\* \* \* \* \* \*

"Murder or anything else. Okay. You can't say, 'Ladies and gentlemen of the jury, I was drunk. King's X, time out. I got to be found not guilty.' You can't do that, the Penal Code says.

"However, intoxication may be considered in mitigation of the punishment if, No. 1, it's raised and, No. 2, if the jury believes it and wants to consider it. It's not a requirement that you consider it as mitigation, but it can be offered to the jury for them to evaluate it as they see fit."

When subsequently asked whether he would consider voluntary intoxication as a mitigating circumstance, Newman said that he would not. Considering the statement of the law given by the court to the venireperson that it is not a requirement that one consider intoxication as a mitigating circumstance, Newman was still following the law, at least as it was given to him, and cannot be said to have been biased against it.[19] We note that Newman stated that there were some factors which he would consider as mitigating. We find no abuse of discretion. Point of error number twenty-two is overruled.

■■■ In point of error number twenty-three, appellant contends that the trial court erred in overruling his challenge for cause to venireperson Howard Stansell because his responses to questions showed he had a predisposition against all offenses involving children, and therefore had a bias or prejudice against the law. Article 35.16(c)(2),

V.A.C.C.P. When challenging Stansell for cause, appellant conceded that the venireperson was not biased as a matter of law nor was he biased against any phase of the law upon which appellant is entitled to rely. See *Anderson v. State,* 633 S.W.2d 851 (Tex.Cr. App.1982). However, appellant maintained that Stansell was, in fact, biased against the defendant. See Article 35.16(a)(9), V.A.C.C.P.

The record reveals that Stansell was the father of a two and a half year old girl. His responses to several questions showed that he believed in the death penalty and felt that violent crimes against children were appropriate cases in which to apply it. He also stated that he felt there were other types of crimes that deserved the death penalty. Since Stansell neither expressed any specific prejudice against appellant, nor was he biased as a matter of law, the determination of whether or not he was biased as a matter of fact was a function of the trial court's discretionary powers. *Kemp v. State,* 846 S.W.2d 289, 299 (Tex.Cr.App.1992).

When answering questions posed by the court, Stansell admitted that he did have a predisposition toward assessing the death penalty in a case involving a small child. He could never state unequivocally that he could evaluate such a case in the same way as he would any other fact situation. At some point in the questioning, Stansell was excused from the room, and appellant raised these concerns. The record reflects that the prosecutor appeared to agree with appellant's counsel that Stansell showed a preconceived bias against those who commit violent offenses against children, *viz:*

"[Prosecutor]: That's a—I don't really disagree with that. I guess the bottom line of this is this: Once the bias is determined, the next step is: Can he set it aside or would he automatically give the death penalty?

"THE COURT: Well, you've got to discuss the bias to see whether it can be set aside."

---

18. We note that the record reveals no objection to the paraphrasing of V.T.C.A., Penal Code, Section 8.04.

19. This would also be the result with regard to age as a mitigating circumstance. *See Trevino v. State,* 815 S.W.2d at 613–14 (Tex.Cr.App.1991).

The trial court then proceeded to question Stansell further, posing a hypothetical based on treason. He asked Stansell whether he would be predisposed to answer the two special issues affirmatively simply in order to achieve the desired result without considering the evidence. Stansell replied that he would not, but could not guarantee anything. He told the court that he would try very hard to answer the questions, setting aside his bias or predisposed opinion.

In making his challenge for cause, appellant stated that Stansell had a bias against those who commit offenses against small children which he was not able to set aside. Appellant pointed out that:

"[Appellant's counsel]: Your Honor, we would—Your Honor, we would further submit to the court that when the juror was equivocating as to his ability to be fair and impartial, he did so in relation to the class of victim, that is, a young child be involved. However, when the Court qualified him, the Court qualified him with a hypothetical not involving the class of victims that were involved, but on the hypothetical of treason and, essentially, the answers to questions 1 and 2 would be irrelevant considerations in regard to the—

\* \* \* \* \* \*

"THE COURT: My only reason for using treason that was a matter about which he expressed a sincere belief that it was a death penalty—

"[Appellant's counsel]: Yes, sir. I'm not criticizing the Court. What I am merely saying is that the Court's questions regarding treason really did not—really did not qualify him again as being a fair and impartial juror in relation to his admitted predisposition against an offense involving a class of victims, that is children."

We disagree with appellant. The record reflects that Stansell had strong feelings concerning the death penalty, especially in a

situation involving a small child. However, his responses to the court's hypothetical, which also involved a fact situation about which he felt strongly, indicated that he would have been able to set aside his preconceptions. Viewing the voir dire in its entirety, and in addition to what we have already stated, Stansell indicated the following:

1) He would not automatically answer the questions to achieve a desired result;

2) He would try very hard to set aside any bias or predispositions;

3) He would not alter or distort his definition of "deliberately" simply because he felt the individual deserved to die;

4) He would consider any mitigating evidence presented;

5) He believed the State had the burden of proof, and the defense has to prove nothing;

6) He would make up his mind after hearing all the evidence.

Therefore, based upon the totality of the record, we hold that, assuming Stansell possessed a bias and prejudice against appellant he was able to set his preconceptions aside. Therefore, the trial court did not abuse its discretion in refusing to grant appellant's challenge for cause. See *Kemp*, supra at 300; *Penrice v. State*, 716 S.W.2d 107, 110 (Tex.App.—Houston [14th Dist.] 1986, no pet.). Therefore, we overrule point twenty-three.

■■■ Appellant alleges in point of error number twenty-four that the court erred in overruling his challenge for cause to venireperson Hampton[20] because his responses showed that he had a predisposition towards the death penalty. This contention is not supported by the record. The record reflects that, although Hampton strongly favored the death penalty, he would answer the punishment questions based on the facts presented at trial. When a venireperson states he will answer the punishment questions

20. This is the same venireperson who is the subject of points of error numbers seventeen and twenty-one.

based on the evidence and not as an automatic response, he is not subject to a challenge for cause. See *Earhart v. State*, 823 S.W.2d 607 (Tex.Cr.App.1991). We find no abuse of discretion. Point of error number twenty-four is overruled.

■■■ In points of error numbers twenty-five and twenty-six, appellant complains that the trial court erred in overruling his challenge for cause to venireperson Thomas Reynolds. Appellant contends that Reynolds was biased against the law because of his predisposition against psychological testimony and he was an "incapable or unfit" juror under Article 35.16(a), V.A.C.C.P.,[21] because "he could not give his full attention, if selected as a juror, due to his workload and he could not assure the court that he would devote his entire attention to the trial."

In response to the alleged predisposition against psychological testimony, the record indicates that Reynolds quite clearly stated there was no evidence of a mitigating nature that he would "flatly refuse" to consider. However, he might have given such testimony less weight since he considered the area to be an imprecise science. Thus, Reynolds did not exhibit a bias against the law, but merely indicated that he would exercise discretion in weighing different types of evidence. In regard to his work situation and giving his full attention to the trial, Reynolds made speculative comments that he would have to work nights at his job to keep up and it would probably be a hardship. However, he also stated that he could be a fair and impartial juror and any work distractions would not impair him to such a degree that he could not be fair and impartial. See *Allridge*, supra; see also *Henley v. State*, 644 S.W.2d 950 (Tex.App.—Corpus Christi 1982, pet. ref'd). We hold the record supports the

trial court's denial of appellant's requested challenges as to both allegations. Finding no abuse of discretion, points of error numbers twenty-five and twenty-six are overruled.

■■■ Appellant alleges in points of error one through four that Articles 37.07(4) and 37.071, V.A.C.C.P., are unconstitutional as applied, and therefore, he was sentenced to death in violation of several provisions, both state and federal. Appellant first asserts Article 37.071 is vague and overbroad because it fails to define terms such as "deliberately," "probability," "criminal acts of violence," and "continuing threat to society." Because of these omissions, appellant's request for the trial court to define said terms in its charge was denied. However, this Court has repeatedly rejected this contention. *Corwin v. State*, 870 S.W.2d 23, 36 (Tex.Cr.App.1993), and cases cited therein. Words which are not defined statutorily are to be given their usual meanings, and no specific instructions are necessary. *Draughon v. State*, 831 S.W.2d 331, 338 (Tex.Cr.App.1992); *Ex parte Jacobs*, 843 S.W.2d 517, 519 (Tex.Cr.App.1992); *James v. State*, 772 S.W.2d 84, 113 (Tex.Cr.App.1989); *Tucker v. State*, 771 S.W.2d 523, 536–37 (Tex.Cr.App. 1988). Because it is presumed that jurors attach a common understanding to the meanings of these terms, there was no error in rejecting appellant's requested definitions.

■■■ Appellant next contends the statute is unconstitutional because the punishment charge did not provide the jury with any meaningful way to consider or give effect to proffered mitigating evidence in answering the special issues pursuant to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant's mitigating evidence, as set forth in his brief, consists of

---

21. While this reason is not one of the specifically enumerated factors of Article 35.16(a), V.A.C.C.P., this Court has held that a challenge can still be properly asserted where such a challenge is based on facts that show that the prospective juror would be "incapable or unfit to serve on the jury." *Allridge*, supra; *Nichols v. State*, 754 S.W.2d 185, 193 (Tex.Cr.App.1988),

cert. denied, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989); contrast *Easterling v. State*, 710 S.W.2d 569, 577 (Tex.Cr.App.), cert. denied, 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 108 (1986). Those grounds not specifically enumerated in the statute are ordinarily addressed to the sound discretion of the trial judge. *Allridge*, 850 S.W.2d at 484–85.

good behavior evidence [22] and evidence of appellant's "abandoned, neglected and ignored childhood," drug and alcohol abuse, exposure to "some witchcraft and other kinds of bizarre experiences," sexual fantasies, sexual abuse as a youth by males and females, including his mother, glue sniffing, and religious convictions.

The trial court submitted the following instruction to the jury:

"You are instructed that you shall consider any evidence which, in your opinion, mitigates against the imposition of the death penalty. In making this determination you shall consider any aspects of the defendant's background, character or record and the facts and circumstances of the offense. If you believe from the evidence that the State has proven beyond a reasonable doubt that the answers to the Special Issues are 'Yes,' but you are further persuaded by the mitigating evidence that the defendant should not be sentenced to death in this case, or you have a reasonable doubt as to whether the death penalty should be imposed against the defendant, then you shall answer one or both of the Special Issues 'No' in order to give effect to your belief that the death penalty should not be imposed in this case.

"Mitigating circumstances are circumstances which do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."

We hold this instruction provided the jury with an adequate vehicle to express and give effect to its "reasoned moral response" to appellant's mitigating evidence, if any existed outside the scope of the special issues. See *Fuller v. State,* 829 S.W.2d 191 (Tex.Cr.App. 1992).

■ Finally, appellant argues that Article 37.07, Section 4 is unconstitutional because it provides no way for the jury to consider the applicable parole laws. He contends that whether or not the accused will be eligible for parole, or whether there is no parole in capital cases, is a constitutionally indispensable part of the process in determining whether to inflict the death penalty. We have previously held that the matter of parole is not a proper consideration for jury determination on punishment in a capital murder trial or any other trial. *Felder v. State,* 758 S.W.2d 760, 762 (Tex.Cr.App.1988), and cases cited therein. We have recently reaffirmed these principles. *Jones v. State,* 843 S.W.2d 487, 495 (Tex.Cr.App.1992). In *Elliott v. State,* 858 S.W.2d 478 (Tex.Cr.App. 1993), we noted that, although the United States Supreme Court has determined that instructions on the possibility of commutation, pardon, or parole do not violate the Eighth and Fourteenth Amendments to the United States Constitution, our State Constitution prohibits such an instruction in a capital murder trial. *Elliott,* supra, 858 S.W.2d at 489, n. 7. Points of error numbers one through four are overruled.

In point of error five, appellant raises complaints to the charge on punishment. Appellant first contends that the trial court erred in overruling his request for definitions of certain terms and his request for an instruction on parole pursuant to Article 37.07, Section 4. As we have already addressed these arguments in our discussion of points one through four and found them to be without merit, it is not necessary to reiterate them here. See *Zimmerman v. State,* 860 S.W.2d 89 (Tex.Cr.App.1993); *Rousseau v. State,* 855 S.W.2d 666 (Tex.Cr.App.1993); *Johnson v. State,* 853 S.W.2d 527 (Tex.Cr.App.1992); *James,* supra; *Tucker,* supra; *Elliott,* supra; *Jones,* supra.

■ Appellant's final complaint regarding the punishment charge is the trial court's failure to apply the law to the mitigating facts presented. Therefore, because the

---

**22.** Evidence characterized as good behavior evidence consisted of testimony that appellant had not been involved in any major disciplinary actions during his two stays in the Texas Department of Corrections.

charge gave only abstract instructions, the jury as sentencer had no guidance in applying evidence presented for purposes of mitigation. Appellant cites no authority for this proposition, and we know of no cases in point. The purpose of the punishment phase of a capital murder trial is to determine whether the defendant should be sentenced to life or death, and the legislature has provided the means by which the jury is to make this determination, namely the special issues. The record reflects that the jury was properly instructed as to each of the two special issues, and in addition was given a charge on mitigation which we have already held to be sufficient.[23] We hold the charge was not defective, and therefore, overrule point of error number five.

■ Appellant again attacks the constitutionality of Article 37.071, V.A.C.C.P., as it applies to him, in points of error six through eight. In point number six, appellant alleges that the statute requires the trial court to "impart inaccurate and misleading information that minimize[s] the importance of the jurors' deliberations and undermines the reliability of the death penalty." In point number seven, appellant contends that the statute is unconstitutional "because the statutory entitlement to a sentence of less than death provided by subsection (e) is improperly depreciated by the misleading operation of subsections (d) and (g)."[24] And, finally, in point number eight, appellant alleges that

the statute, specifically Subsection (g), operated to deny him effective assistance of counsel by prohibiting him from informing jurors of the effect of their failure to agree on an answer to the punishment issues. In all three of these points appellant complains of some aspect of the operation of Subsections (d), (e), and (g) of Article 37.071, V.A.C.C.P.

■ The State asserts, and appellant concedes, that no objection was raised, nor any motion made, at trial concerning the constitutional operation of this statute as it pertained to appellant with respect to these three points of error. Because Article 37.071 was not facially unconstitutional, nor was it "void ab initio"[25], appellant was required to object at trial in order to preserve any error for purposes of appeal. Tex.R.Crim.Evid. 103(a)(1); see also Ex parte Russell, 738 S.W.2d 644, 647 (Tex.Cr.App.1986). Even constitutional errors may be waived by the failure to object at trial. Briggs v. State, 789 S.W.2d 918, 924 (Tex.Cr.App.1990). Since the rights alleged to have been violated in points of error six through eight were recognized at the time of trial, appellant cannot now raise these points for the first time. See Selvage v. Collins, 816 S.W.2d 390, 392 (Tex. Cr.App.1991); see also Jackson v. State, 745 S.W.2d 4, 5 at n. 2 (Tex.Cr.App.1988), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Points of error numbers six through eight are overruled.[26]

Finding no reversible error, we affirm the judgment of conviction and the sentence of death.

23. Individual jurors may give such evidence differing interpretations—what may be mitigating to one person may be aggravating to another. Were this Court to agree that the trial court must instruct jurors on how to weigh and give effect to this evidence, such a determination may run afoul of constitutional principles.

24. At the time of appellant's trial, these sections of Article 37.071, V.A.C.C.P., read as follows:
"(d) The court shall charge the jury that:
"(1) it may not answer any issue "yes" unless it agrees unanimously; and
"(2) it may not answer any issue "no" unless 10 or more jurors agree.
"(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under

this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.
"(g) The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article."

25. See Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

26. Even had proper objections been lodged, we note that similar contentions have already been recently rejected. Nobles v. State, 843 S.W.2d 503, 508–510 (Tex.Cr.App.1992); Sterling v. State, 830 S.W.2d 114, 121–122 (Tex.Cr.App. 1992); Davis v. State, 782 S.W.2d 211, 221–222 (Tex.Cr.App.1989).

BAIRD, J., concurs in the disposition of point of error No. 23, and otherwise joins the opinion.

CLINTON, J., dissents.