NO. 07-04-0091-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



DECEMBER 16, 2004



______________________________




ELOY CARL CRUZ, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;



NO. 45,632-A; HONORABLE RICHARD DAMBOLD, JUDGE



_______________________________



Before JOHNSON, C.J., and REAVIS and CAMPBELL, JJ.

MEMORANDUM OPINION


 Following a plea of not guilty, (1) appellant Eloy Carl Cruz was convicted by a jury of
possession of marijuana, and the trial court assessed a sentence of one year confinement

in a state jail facility. In presenting this appeal, counsel has filed an Anders (2) brief in
support of a motion to withdraw. We affirm and grant the motion to withdraw. 

 In support of his motion to withdraw, counsel certifies that he has diligently reviewed
the record and, in his opinion, it reflects no reversible error or grounds upon which an
appeal can be predicated. Anders v. California, 386 U.S. 738, 744-45, 87 S.Ct. 1396, 18
L.Ed.2d 493 (1967). In the brief accompanying the motion to withdraw, counsel reviews
the indictment, pretrial proceedings, voir dire, evidence introduced at trial, arguments, jury
charge, objections made by trial counsel during the underlying proceedings, the
punishment hearing, sentencing, and the effectiveness of appellant's trial counsel. He then
concludes the appeal is frivolous and without merit. In compliance with High v. State, 573
S.W.2d 807, 813 (Tex.Cr.App. 1978), counsel discusses why, under the controlling
authorities, there is no error in the court's judgment. Counsel also shows that he has sent
a copy of the brief to appellant, and informed appellant that, in his view, the appeal is
without merit. In addition, counsel demonstrates that he notified appellant of his right to
review the record and file a pro se response if he desired to do so. Appellant has not
availed himself of that opportunity. Neither has the State favored us with a brief. 

 By his brief, counsel contends "an issue that needs to be addressed is whether the
Defense should have objected to the State's comments while questioning Appellant in
regard to his prior conviction for a Class A misdemeanor possession of marijuana." (3) 
According to counsel, appellant's trial counsel could have voiced a legitimate objection to
the State's impeachment of appellant by that evidence. See Tex. R. Evid. 609(a)
(providing that evidence that the witness has been convicted of a crime shall be admitted
if elicited from the witness or established by public record but only if the crime was a felony
or involved moral turpitude). Counsel concludes, however, that: (1) trial counsel may have
had a sound trial strategy for not objecting; and (2) the evidence of appellant's guilt
independent of that deficiency "was conclusive of the offense charged." Counsel appears
to suggest that appellant would be unable to prevail upon an ineffective assistance of
counsel claim on the basis of trial counsel's failure to object. We agree. 

 A claim of ineffective assistance of counsel is reviewed under the standard set out
in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under
that standard, a defendant must establish that: (1) counsel's performance was deficient
because it fell below an objective standard of reasonableness; and (2) a reasonable
probability sufficient to undermine confidence in the outcome existed that, but for counsel's
unprofessional errors, the result of the proceeding would have been different. Rylander
v. State, 101 S.W.3d 107, 110 (Tex.Cr.App. 2003 ). Failure to make the required showing
of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.
Garcia v. State, 887 S.W.2d 862, 880 (Tex.Cr.App. 1994), cert. denied, 514 U.S. 1021,
115 S. Ct. 1368, 131 L.Ed.2d 223 (1995). Any allegation of ineffective assistance of
counsel must be firmly founded in the record, and the record must affirmatively
demonstrate the alleged ineffectiveness. Thompson v. State, 9 S.W.3d 808, 813
(Tex.Cr.App. 1999). Generally, the record on direct appeal will not be sufficient to show
that counsel's conduct was so deficient as to meet the first prong of the Strickland standard
as the reasonableness of counsel's choices often involves facts that do not appear in the
record. See Mitchell v. State, 68 S.W.3d 640, 642 (Tex.Cr.App. 2002). Instead, an
application for a post-conviction writ of habeas corpus is usually the appropriate manner
in which to raise and develop claims based on ineffective assistance of counsel. Id. 

 Here, it is possible, as counsel suggests, that the lack of an objection by trial
counsel to the admission of the evidence of appellant's misdemeanor conviction, is
consistent with a theory of the case that "although [appellant] was a marijuana user, all the
marijuana found on the date in question should not be charged to him" and that "as he has
admitted to wrongs in the past, he would do the same now if one had occurred." 
(Emphasis in original). In any event, the record is insufficient to establish whether trial
counsel's conduct was so deficient as to meet the first prong of the Strickland standard. 
Furthermore, because there was overwhelming evidence of appellant's guilt independent
of trial counsel's failure to object, we cannot, on this record, presume appellant would 
prevail on the second prong of that test either. 

 We have also made an independent examination of the entire record to determine
whether there are any other arguable grounds which might support this appeal. See
Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988). We have found no
non-frivolous issues and agree with counsel that the appeal is without merit. Currie v.
State, 516 S.W.2d 684 (Tex.Cr.App. 1974).

 Accordingly, counsel's motion to withdraw is hereby granted and the judgment of the
trial court is affirmed. 

 Don H. Reavis 

 Justice

 


Do not publish. 

1. Appellant testified that although the marijuana on his person was his, he denied
having possession of the marijuana found in the sofa.
2. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).
3. The record reveals that appellant was charged with a felony, but was convicted of
a lesser included misdemeanor possession offense.


160;    Following a consolidated bench trial, Appellants, Linda Little and Walter Little, were
convicted of enticing a child, a Class B misdemeanor, and sentenced to 90 days
confinement, suspended in favor of one year community supervision.


 Appellants contend
the trial court erred in its determinations that: (1) the evidence in support of their
convictions was legally sufficient; (2) the evidence in support of their convictions was
factually sufficient; and (3) the testimony of their character witness, Nicole Gonzales, was
properly excluded at trial. We affirm. 
Background
          In the Fall of 2005, Abigail Medina was sixteen years old and living with her mother,
Matilde Medina. Abigail began dating Steven Little, whose parents are the Appellants
herein.


 Although Matilde initially approved of their dating relationship, she began to have
doubts when Appellants invited Abigail to their house to watch prophetic videos and
receive religious instruction; informed her the dating relationship would be no contact–no
hand-holding or kissing; requested that Matilde give them a set schedule of when Abigail
would be in their home; and offered to pay one-half of the expense of an internet
subscription for the Medinas. When Walter offered to pay one-half of their internet
subscription, Matilde informed him that her computer was not working. Afterwards, she
arrived at home to find him repairing her computer and learned that, at least for a portion
of the time he was there, he had been alone with her two daughters. Matilde refused to
give Appellants a fixed schedule and turned down Walter’s internet offer.
          While Steven and Abigail were dating, Matilde allowed Abigail to attend Steven’s
Seventh Day Adventist Church on Saturdays and her regular church, a small Spanish
Assembly of God Church, on Sundays. Abigail enjoyed going to Appellants’ house
because they did a lot of fun things such as watching movies and playing games. There
were problems at her home,


 and she preferred spending time with Appellants. 
          After associating with Appellants, however, Abigail’s attitude and behavior toward
her family changed. She would not eat with her family on Sabbath Days, Friday and
Saturday nights, complaining the food was bought from a store or restaurant. She also quit
speaking with her mother’s live-in fiancé, Carlos Olivas, because she now believed he was
a sinner and could not be trusted. She also would not speak to her mother or allow her to
hug her or let her close. Abigail stated that Appellants’ religion was now her religion, and
Walter was her “daddy.” When confronted about not following her mother’s wishes, Abigail
told Matilde that she was no longer under her authority.
          On December 12, Matilde gave Abigail permission to have dinner at Appellants’
house. Matilde became worried when Abigail was hours late returning and called
Appellants. Linda told Matilde that her husband had left an hour earlier to bring Abigail
home. In fact, he and Abigail were sitting alone in his parked car down the block from the
Medina’s house for more than forty-five minutes. Her daughter indicated Walter had been
giving her advice about Steven. 
          On December 16, Matilde allowed Abigail to visit Appellants and see Steven off at
the airport. After Steven left, Appellants asked Matilde if Abigail could spend the night. 
Matilde declined the invitation. On December 20, Matilde permitted Abigail to have dinner
with Appellants at their home. When she called home from work at 8:00 p.m., her younger
daughter told her Abigail was not at home and that Abigail had spoken with Walter on the
phone two days earlier for five hours. Matilde immediately called Walter and told him
enough was enough. Matilde told him to bring her daughter home and never to speak with
her again. When Matilde returned home two hours later, Abigail had not returned. When
Matilde called Appellants on their home and cell phones, there was no response. Matilde
sent Carlos to Appellants’ house to pick up Abigail. When he arrived, Walter told Carlos
that his wife had left with Abigail to take her home. At that point, Matilde informed Abigail
that she could not see Steven or Appellants anymore. Unbeknownst to Matilde during this
period, Appellants were talking to Abigail about moving in with them. 
          Following this confrontation, Abigail began receiving letters and gifts from Appellants
at her home. Matilde also received a three page, single-spaced typewritten letter from
Walter generally denigrating Matilde and stating “[t]he only reason you don’t have a major
rebellion on your hands already with Abby is because of my teaching her on submission
to Godly authority.” Walter’s letter made no mention of Appellants’ desire that Abigail
come live with them. 
          Abigail also began sneaking out of her house to attend church with Appellants. 
When Matilde confronted Abigail, Abigail indicated Matilde was no longer her authority;
Walter was her father, and she wanted to live with Appellants. Matilde again asked Abigail
to sever her relationship with Appellants and Steven.
          During this same period, Abigail began telling Matilde that their house was filled with
sin. Walter had instructed Abigail to be spiritually prepared for all the demons living in their
house because Matilde and Carlos were living out of wedlock. Abigail told Matilde she
didn’t belong in her home any longer because she had to fight demons every day and she
belonged with her daddy, Walter. Abigail cried daily and spent a lot of time in her closet
during the daytime. At times, Matilde found Abigail in her closet with her Bible where she
twice slept overnight. Abigail also believed certain objects including her teddy bears were
possessed by demons. The only place Abigail could find comfort was in her closet with her
Bible. She told Matilde that her home was Walter’s home, and she wanted to live there.
          Before Christmas, Walter prepared a form for Matilde’s signature giving Abigail
permission to live with Appellants. The document was drafted by Walter and delivered by
Steven to Abigail at school. Appellants told Abigail to show the document to her mother
and see if she would sign it.


 After Christmas, Walter purchased a cassette tape recorder
for Abigail. He would tape messages on a cassette tape and have the tape delivered to
Abigail through Steven at school. Abigail would listen to the message, tape her response
on the same cassette, and swap the tape back and forth.
          On December 31 and January 16, Matilde discovered her daughter speaking with
Walter on their phone. After each incident, Matilde called the police and the police then
spoke with Walter. On January 20, Sergeant Brush of the Amarillo Police Department
came to her home and received permission to have Abigail tested to see whether she had
been sexually assaulted. The test was negative.
          On January 21, Abigail attended the ROTC Ball at her high school. Matilde later
learned that Appellants sat with Abigail during the dinner. Matilde reported the incident to
the police and enlisted the assistance of a ROTC official, a math teacher, Abigail’s high
school principal, the school’s liaison officer, and school counselors to protect her child from
Appellants. 
          A letter dated January 30 from Linda to Abigail stated:
You have become a part of this family. . . . I have long prayed for a daughter
that would hunger and thirst for God. In you, those prayers have been
answered. . . . I also wait for the day you come home to us. . . . We look
forward to sharing simple things in life with you . . . cooking, playing games
(Boogle anyone?), watching movies, going to a park on a picnic, walking in
the park, playing some basketball, and most importantly sharing truth that
God wants you to know and have in your treasury. . . . Soon Abby you will
be with us. I see it in my minds eye.
 
          Abigail began begging her mother to allow her to leave and live with Appellants. 
She told Matilde that God wanted her to live with Appellants; Appellants were her family;
Matilde was not her authority–not her mother; and God would make it happen. She further
indicated that Walter was her real father and her family was not her God-given family,
Appellants were.
          Matilde hired sitters to stay with her daughter while she was at work to keep her
daughter away from the telephone and assure Appellants did not contact her. On February
2, a sitter observed Appellants approaching Abigail at a choir concert and giving her hugs. 
When Matilde confronted her daughter, Abigail told her that God had told Walter she
belonged to him. Abigail also told her mother that Walter had said: “He is my father and
in two weeks you’re going to take me to—and give me away to him. God has spoken. It
will happen, so I’m not worried about it anymore.”
          On February 18, nearly two weeks later, Abigail decided to run away from home. 
She called Walter, told him her plans, and asked if he would pick her up the next morning
at 2:00 a.m. Walter agreed and told her to call him when she was ready. The following
morning at 2:00 a.m., Appellants were waiting for Abigail in their car across the street from
the Medina house. Abigail left a note for her mother to find. Over the next nineteen hour
period that Abigail was with Appellants, they went to breakfast, lunch, a movie, and to a
church.


 They did not go to Appellants’ home because they were afraid they would be
discovered there. During the course of the day, Abigail changed her mind about running
away, and told Appellants she wanted to return home. In the evening, Abigail testified they
went to a church to “talk without anybody bothering us or any worries about anybody
finding us.” They talked about her living with them and going back home. At 9:00 p.m. the
police were called and they returned Abigail to her mother at 11:00 p.m., after which Abigail
met with her pastor. 
          The next morning Abigail told her mother she had been with Appellants and
apologized for leaving. Abigail told her it was preplanned and she had been instructed to
write the runaway note. Soon thereafter, Matilde discovered an undated card from Walter
to Abigail which stated:
Missing you Abby. Distance never separates hearts that really care. Though
we may not spend as much time together as we’d like . . . You’re always in
my thoughts because you’re always in my heart. I love and miss you very
much, mi jita! Love always, Dad. (See back).
 
To my adorable daughter, Just a quick note to go along w/this token of my
love for you. I will be praying for you today for strength to carry on and
encouragement as God’s hand moves to bring you home. I’ll also be fasting
all day Wed for you–remember I’m on vacation this week. Some quick high-lights: (1) Remember your mother saying we could not “afford you” . . . So
as you can see, God is taking care of that as well. You will be WELL taken
care of. . . . (3) We now have Caller I.D. and call forward on the line so if you
call our toll free # and we’re not at home, it’ll forward to my cell phone. I
need a big hug from my loving daughter! I love you so very much, Abby! 
You are truely my precious daughter. Love you always, Dad. P.S. How was
your talk w/Steven? I’ll tell you what God told me to do when we talk again. 
Steven has free will like the rest of us, so it’s still his decision to follow God
or not. 
 
          Matilde then hired an attorney to keep Appellants away from her daughter. In a
letter to Appellants dated March 7, her attorney directed them to cease all contact with
Abigail, or legal action would be taken. 
          On March 10, during Spring Break, Matilde searched her daughter’s room and found
personal letters, cards, and notes to her daughter from Appellants. After Matilde’s mother
had prohibited Abigail from communicating with Appellants in December 2005, Walter
developed a number of ways of communicating with Abigail. Steven would give Abigail
letters and candy from Appellants at school. She and Walter would communicate by giving
messages to her friend, Marshall, also at school. Walter also arranged for them to speak
through voice-mail. Abigail would dial a toll-free number, give her password and either
receive messages or leave messages for Walter and so forth.  
          Walter also had an agreement with Abigail that she would meet and talk with him
each morning when he dropped Steven off at school.


 In fact, after Appellants were
arrested, Walter continued to meet with Abigail in this fashion even though it was a
violation of his appearance bond. 
          After Appellants were arrested, Walter drafted a document dated April 13, 2006,
entitled “My Statement” and instructed Abigail to sign and notarize the document. He also
instructed Abigail to re-type the document so that it would appear that Abigail had written
it. When Abigail completed her re-drafting, the document was ninety percent Walter’s
language and ten percent her own. Walter also told Abigail that the document was
intended to be used in court to obtain custody of Abigail. Abigail last spoke with Appellants
near the end of April or early May 2006. Walter told Abigail that he had thrown away all
the letters she had sent him and their tapes. 
          Abigail testified that she continued to see Appellants after her mother forbade her
to do so because she wanted to see them. She testified Appellants called her “daughter,”
and she called them “mom” and “dad.” She indicated Appellants were very supportive of
her and expressed a lot of love for her. She testified Appellants encouraged her to leave
her home and live with them. Walter also testified that Appellants encouraged Abigail to
live with them and that Abigail wanted to live with them. 
          Abigail testified as follows:
At one point I did not want to keep—I did not want to keep disobeying my
mother and lying and doing all the secretive things that I was doing—but they
encouraged me and I just kept going. I said, okay. I’ll do just one more lie. 
I’ll disobey my mom one other time. That–I did not tell them that though.
 
On April 5, 2006, Appellants were charged with enticing, persuading, or taking Abigail from
the custody of her mother without her mother’s consent. State’s Failure to File Appellate Brief
          Appellants’ briefs were filed April 18, 2007.


 The State’s brief was due on or before
May 18, 2007. Tex. R. App. P. 38.6(b). The State did not file a brief nor request additional
time in which to do so. Rule 38.8(b) of the Texas Rules of Appellate Procedure expressly
guides this Court as to what to do if an appellant fails to file a brief; however, there is no
corresponding rule to guide us when the State fails to file a brief in response to an
appellant’s brief. Several intermediate appellate courts, including this Court, have held that
whenever the State fails to file a brief, an appellate court should conduct an independent
analysis of the merits of the appellant’s claim of error, limited to the arguments raised at
trial by the State, to determine if there was error. See Siverand v. State, 89 S.W.3d 216,
220 (Tex.App.–Corpus Christi 2002, no pet.); Haley v. State, No. 13-02-0033-CR, 2006 WL
3374971 (Tex.App.–Corpus Christi Nov. 22, 2006, pet. ref’d) (not designated for
publication); Mosley v. State, Nos. 07-02-0178-CR, 07-02-0179-CR, 2003 WL 21919261
(Tex.App.–Amarillo Aug. 12, 2003, pet. ref’d) (not designated for publication); cf. In re
Bowman, No. 03-07-0418-CR, 2007 WL 4269842 (Tex.App.–Austin Dec. 5, 2007, no pet.)
(not designated for publication); Burns v. Rochon, 190 S.W.3d 263 (Tex.App.–Houston [1st
Dist.] 2006, no pet.). The decision to independently review the merits of Appellants’ issues
should not be construed as approval of the State’s dereliction of its responsibility to file a
brief. The State’s failure to file a brief, in this or any other action, makes the job of this
Court considerably more time consuming and difficult.
                                                            Discussion
           Appellants raise the following three issues: (1) the evidence was legally insufficient
because Abigail testified that Appellants did not persuade her to leave her home, i.e., she
left voluntarily; (2) the evidence is factually insufficient to show that caring for a runaway
child for nineteen hours is not a sufficient amount of time to constitute an interference with
the child’s custody; and (3) the testimony of their character witness, Nicole Gonzales, was
improperly excluded by the trial court as irrelevant. 
          I.        First Issue – Legal Sufficiency of the Evidence
          When conducting a review of the legal sufficiency of the evidence to support a
criminal conviction, we view the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential elements of the
offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct.
2781, 2789, 61 L.Ed.2d 560, 573 (1979); McKinney v. State, 207 S.W.3d 366, 374
(Tex.Crim.App. 2006); Drichas v. State, 175 S.W.3d 795, 798 (Tex.Crim.App. 2005). For
purposes of appellate review of the legal sufficiency of the evidence to support a
conviction, this Court must give deference to the responsibility of the fact finder to fairly
resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences
from basic facts to ultimate facts. Hooper v. State, 214 S.W.3d 9, 13 (Tex.Crim.App.
2007). We do not resolve any conflict of fact, weigh any evidence, or evaluate the
credibility of any witnesses, as this is the function of the trier of fact. See Dewberry v.
State, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Instead, we determine whether both the
explicit and implicit findings of the trier of fact are rational by viewing all the evidence
admitted at trial in the light most favorable to the adjudication. Adelman v. State, 828
S.W.2d 418, 422 (Tex.Crim.App. 1992).  
          A person commits the offense of enticing a child if, with the intent to interfere with
the lawful custody of a child younger than eighteen years, he knowingly entices,
persuades, or takes the child from the custody of a parent or guardian. Tex. Penal Code
Ann. § 25.04(a) (Vernon 2003).


 Enticement of a child is a crime against the parents
rather than the child because the parent loses the privilege of society and custody, care,
control, and services of the child. 19 Tex. Jur. 3d Criminal Law § 526 (2000). To “entice”
means to “draw on; to instigate by inciting hope or desire; to allure, especially in a bad
sense; to lead astray; to tempt; to incite.” Escobar v. State, 138 Tex.Crim. 71, 133 S.W.2d
781, 783-84 (1939). 
          That Abigail may have left home voluntarily is no defense to the offense of enticing
a child. See Sanchez v. State, 712 S.W.2d 170, 171 (Tex.App.–Austin 1986, no pet.)
(“Under this statute, the consent of the minor is irrelevant and it is of no legal effect that her
actions in leaving are in fact voluntary.”); Truelove v. State, 96 Tex.Crim. 537, 258 S.W.
826, 827 (1924). Refusing to recognize a defendant’s asserted defense that the minor left
home voluntarily, the Texas Court of Criminal Appeals stated:
[w]e are not impressed with the soundness of such doctrine. In this instance
the person offended against is not the minor but the parent of the minor who
thus loses the privilege of the society and the custody, care, control and
services of such minor. It is the parent’s duty, and should be his pleasure,
to train and care for the child, and attempt to bring it up in such a manner
that it may become a useful member of society. This is a valuable right, and
by proper thinking parents treasured most highly. That such a right can be
wished away at will by a wayward child is not based upon sound reason,
and, in our judgment, the voluntary leaving home with another,–who might
have held out enticing and alluring ideas and promises to such child,–should
not be a proper defense to a charge such as this.
 
Escobar, 133 S.W.2d at 782-83.
 
          Appellants rely upon Cockrell v. State, 71 Tex.Crim. 543, 160 S.W. 343 (1913) for
the proposition that it is the child’s state of mind that determines if the child was enticed to
run away. Cockrell is of no assistance to Appellants. The facts of Cockrell are markedly
different from this case. In Cockrell, the accused was a nineteen year old girl and the child
allegedly enticed was her eighteen year old cousin. The child had been severely
disciplined by her father, and the accused told her that she would leave home before she
would stand such treatment. Subsequently, the child left her house and traveled, in part
with the accused, to Oklahoma to escape from her enraged father, who had been
searching for her with a gun. The court determined that no one enticed the child to leave
her home. Rather, she was forced to abandon her home because of extreme measures
taken by her father. That the accused expressed her sentiments and accompanied the
child on her flight from her father did not amount to enticement. Id. at 345. The Cockrell
court stated, “it must be shown the minor left the home of its parents at the instance,
suggestion, and by the persuasion of the person accused.” Id. 
          Here, the record is replete with evidence that, prior to Abigail leaving her mother’s
home, Appellants not only suggested, but encouraged, persuaded, and enticed Abigail to
leave the Medina home in a variety of ways. Appellants criticized her mother’s lifestyle
from a moral and religious perspective while encouraging Abigail to leave her family and
come live with them. They estranged Abigail from her home and family by teaching her
that her mother and live-in fiancé were living in sin and that demons possessed her house. 
They played upon Abigail’s religious convictions by telling her Walter was her God-given
father; they were her God-given family; and God preordained that she should come live
with them. Walter encouraged Abigail to disobey and lie to her mother in order to conduct
clandestine communications contrary to her mother’s wishes. He bought her a tape
recorder to swap messages; sent her letters and candy through his son; established a
telephone voice mail account for them to swap messages; and pre-arranged secret
meetings each school day when he dropped his son off at school. Even after his arrest,
he continued this behavior. Appellants also gave Abigail gifts and assured her she would
be well taken care of if she came to live with them. And, when Abigail agreed to run away
from her mother’s home, Appellants immediately decided to, and did, supply the manner,
means, and opportunity for her to leave her home and remain secreted from her mother
for a period of nineteen hours. Unlike the accused in Cockrell who merely expressed her
sentiments and accompanied the runaway for part of her journey, 160 S.W. at 345,
Appellants did much, much more. 
          We find, based upon the record, the State’s evidence was legally sufficient to satisfy
all elements for proving the offense of enticing a child. Appellants’ first issue is overruled.
          II.       Second Issue – Factual Sufficiency of the Evidence
          When conducting a factual sufficiency review, we examine all the evidence in a
neutral light and determine whether the trier of fact was rationally justified in finding guilt
beyond a reasonable doubt. Roberts v. State, 220 S.W.3d 521, 524 (Tex.Crim.App.), cert.
denied, 128 S.Ct. 282, 76 U.S.L.W. 3165 (2007); Watson v. State, 204 S.W. 3d 404, 415
(Tex.Crim.App. 2006). We are to give deference to the factfinder’s determination if
supported by the record, and cannot reverse a conviction unless we find some objective
basis in the record that demonstrates that the great weight and preponderance of the
evidence contradicts the verdict. Id. at 417. The criminal verdict will be set aside “only if
the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the
contrary evidence so strong that the standard of proof beyond a reasonable doubt could
not have been met.” Garza v. State, 213 S.W.3d 338, 343 (Tex.Crim.App. 2007). In
addition, we must include a discussion of the most important evidence that the appellant
claims undermines the verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).
          Appellants contend that, because Abigail was gone from home no longer than
nineteen hours, Appellants did not interfere with, or take Abigail from, the “custody” of her
mother. The Texas Penal Code does not define the term “custody.” Thus, we must
construe the language in context according to the rules of grammar and usage; Tex. Gov’t
Code Ann. § 311.011(a) (Vernon 2005); Dowthitt v. State, 931 S.W.2d 244, 258
(Tex.Crim.App. 1996), while keeping in mind that words undefined by statute that have not
acquired a technical meaning should be given their ordinary meaning. Garcia v. State, 887
S.W.2d 846, 859 (Tex.Crim.App. 1994). The term “custody” appears twice in the Texas
Penal Code. § 25.04(a). The first reference is to the “lawful custody of a child,” and the
second reference is to the “custody of the parent or guardian or person standing in the
stead of the parent or guardian of such child.” Id. (emphasis added). 
          In Cunyus v. State, 727 S.W.2d 561 (Tex.Crim.App. 1987), the Court considered
the family law concept of custody in its determination of whether the defendant intended
to interfere with the custody of the childrens’ parents. Id. at 564. In making its
determination, the Cunyus Court found it unnecessary to consult the Texas Family Code
which establishes the principle of custody of a child through a detailed, statutory scheme
in lieu of the Texas Supreme Court’s pronouncement in Leithold v. Plass, 413 S.W.2d 698
(Tex. 1967).


 Cunyus, 727 S.W.2d at 564. In Leithold, the Supreme Court described the
term “custody” as follows:
‘[c]ustody’ of a child connotes the right to establish the child’s domicile and
includes the elements of immediate and direct care and control of the child,
together with provisions for its needs. 
 
413 S.W.2d at 700.
 
          The definition of “custody” cited in Cunyus comports with the term’s technical and
common usage. Although the Texas Family Code does not specifically define the term
“custody,” the Family Code does define “legal custody” and “physical custody.” Tex. Family
Code Ann. § 152.102 (11), (14) (Vernon 2002). “Legal custody” is “managing
conservatorship of a child,” and “physical custody” is “the physical care and supervision of
a child.” Id.


 These definitions are compatible with the rights and duties of parents to
have physical possession of their child, direct their moral and religious training, establish
their residence, and provide care, control, protection, and reasonably discipline their child. 
See generally Tex. Fam. Code Ann. § 151.001 (Vernon 2002).


 
          In determining whether the evidence established that the defendant intended to
interfere with the custody of the children, the Cunyus Court asked whether the defendant’s
actions “interfere[d] with the parents’ rights to establish the child’s domicile, [citation
omitted], or intrude[d] upon the parents’ exercising their right to care for and control the
child.” 727 S.W.2d at 564. The Court determined that the parents’ ability to control or
raise their child was unaffected or diminished where the defendant suggested one child call
its parents to ask permission to accept defendant’s offer to go to the movies, and the
defendant ultimately offered and took the children home. Id. at 564-65. (emphasis added). 
Clearly, Cunyus does not apply here. 
          Appellants suggest that § 25.06 of the Penal Code, pertaining to the offense of
Harboring a Runaway Child, supports their contention that the period of time involved in
this case is factually insufficient to support a conviction. That one may defend against a
charge of harboring a runaway child if that person notified “a law enforcement agency or
a person at the child’s home of the presence of the child within 24 hours of discovering that
the child was voluntarily absent from home” without parental consent is irrelevant here.


 
The Legislature did not establish such a defense or time limitation in § 25.04(a), and we
will not imply one. That the Legislature established such a defense under § 25.06
indicates they are capable of amending § 25.04(a) if they so desire. 
          Custody of a child is comprised of a bundle of common law and statutory rights and
duties belonging to a parent or legal guardian. As such, we find it unnecessary to choose
between the definitions set forth above in reaching our decision. Here, the evidence shows
Appellants intended to interfere with Matilde’s custody of Abigail by actively encouraging
Abigail to leave her home and supplying assistance to her in a pre-planned exit. 
Appellants agreed to provide Abigail with the means and opportunity to run away and
picked her up at the Medina home at 2:00 a.m. without informing Matilde or asking her
permission. The evidence shows Appellants then knowingly took Abigail into their charge
and control and secreted her from Matilde for nineteen hours. Moreover, the evidence also
establishes that Appellants’ relentless pursuit of their goal of obtaining custody of Abigail
interfered with Matilde’s custody under any of the above definitions. Accordingly, we find,
based upon the record, the State’s evidence was factually sufficient to satisfy all elements
for proving the offense of enticing a child. Appellants’ second issue is overruled.
          III.      Third Issue - Character Testimony
          Appellants contend the trial court erred by excluding the character evidence
testimony of Nicole Gonzales. During the guilt/innocence phase of the trial, Appellants
called Gonzales as a witness. Prior to Appellants having the opportunity to ask Gonzales
any questions, the State objected to relevancy of her testimony. In response to the
objection, Appellants’ counsel stated:
Your honor, this witness will be testifying basically to the extent that Mr. Little
and Mrs. Little have actually helped other young ladies in the past, and;
therefore, you know, that’s what’s going on in this case and not that they had
any intent to do anything with Abigail other than to help her.
 
          At that time, the State requested to take the witness on voir dire to establish that she
had no personal knowledge as to the relationship between Appellants and Abigail. During
the State’s voir dire of Gonzales, she testified she knew Appellants but did not know
Matilde or Abigail. She further testified that she had never been present when Appellants
were in Abigail’s company. At that point, the trial court sustained the State’s objection
without any further testimony from Gonzales.
          Because the State failed to favor us with a brief, we are limited in our review of this
issue to the arguments raised at trial by the State. Here, the only objection raised by the
State was relevance. Because trial courts are in the best position to decide substantive
admissibility questions, we must review the trial court’s ruling on admissibility under an
abuse of discretion standard. Powell v. State, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001).
Under this standard, an appellate court should not reverse a trial court whose ruling was
within the zone of reasonable disagreement. State v. Mechler, 153 S.W.3d 435
(Tex.Crim.App. 2005). Therefore, the question that we must determine is whether the trial
court’s decision that Gonzales’s testimony was not relevant is within the zone of
reasonable disagreement.
          Relevant evidence is evidence having any tendency to make the existence of any
fact that is of consequence to the determination of the action more probable or less
probable than it would have been without the evidence. Tex. R. Evid. 401. Relevant
evidence is presumed admissible. Tex. R. Evid. 402; Erazo v. State, 144 S.W.3d 487, 499
(Tex.Crim.App. 2004). Evidence that is not relevant is inadmissible. Tex. R. Evid. 402. 
Error may not be predicated upon a ruling which excludes evidence unless a substantial
right of a party is affected, and the substance of the evidence was made known to the court
by offer, or was apparent from the context in which questions were asked. Tex. R. Evid.
103(a)(2). Here, no formal offer of proof in question and answer form was made by
Appellants; however, their counsel did make the substance of the proffered evidence
known to the court. Specifically, Appellants’ counsel informed the court that the substance
of Gonzales’s testimony concerned the extent to which Appellants may have helped other
young ladies in the past. Whether Appellants had ever helped other young ladies in the
past is not evidence having any tendency to make the existence of any fact that is of
consequence to the determination of their guilt or innocence more or less probable than
it would have been without the evidence. Therefore, on its face, the proffered testimony
was not relevant.
          Appellants argue further that their “counseling character” would have been relevant
to the issue of their intent to commit the charged offense. Evidence of other acts may be
admissible for purposes of proving intent. Tex. R. Evid. 404(b). In this case, the trial court
determined that evidence of Appellants’ counseling character did not make the existence
of an intent to interfere with the lawful custody of Abigail more probable or less probable. 
We cannot find that decision to be outside the zone of reasonable disagreement. 
Therefore, we conclude the trial court did not abuse its discretion in excluding Gonzales’s
testimony. Appellants’ third issue is overruled.
Conclusion
          Accordingly, the trial court’s judgments are affirmed.
 
                                                                           Patrick A. Pirtle 

                                                                                  Justice 



Publish.