IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-71,488






EUGENE ALVIN BROXTON, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM CAUSE NO. 599218 IN THE 209TH DISTRICT COURT

HARRIS COUNTY





 Keller, P.J., delivered the opinion of the Court in which MEYERS, PRICE,
WOMACK, KEASLER, HOLCOMB, and COCHRAN, JJ., joined. JOHNSON and
HERVEY, JJ., concurred in the result.



 Appellant was convicted of capital murder and sentenced to death. (1) This Court affirmed his
conviction and sentence, (2) but appellant obtained relief via habeas corpus in federal court and
received a new punishment hearing. (3) At the new punishment hearing, the jury answered the
applicable special issues (4) in the State's favor, and the trial court sentenced appellant to death. (5) We
shall affirm. 

I. LEGAL SUFFICIENCY - FUTURE DANGEROUSNESS


 In point of error three, appellant contends that the evidence is legally insufficient to support
the jury's answer to the "future dangerousness" special issue. (6) He argues that the evidence shows
he does not constitute a threat to prison society. He bases this argument on psychiatric testimony
and on a record of good behavior in prison while on Death Row.

A. Facts


 Testifying for the State at appellant's 1992 capital murder trial, Dr. Walter Quijano opined
that appellant constituted a future danger to society. At appellant's 2003 punishment hearing,
Quijano testified for the defense. He testified that he reviewed appellant's prison records for the past
twelve years and found no violent disciplinary cases. He also observed that appellant had been
designated "work-eligible," a designation that showed a degree of trust and responsibility not
enjoyed by other inmates. Quijano gave his opinion that appellant's twelve years of good behavior
on Death Row indicated that appellant did not in fact constitute a future danger inside the prison
system. On cross-examination, however, Quijano admitted that his opinion with regard to
appellant's danger to free society had not changed. Quijano further testified that appellant suffered
from antisocial personality disorder and that appellant's pattern of criminal behavior showed an ever-continuing escalation of violence. 

 The State points out that the record shows appellant to have an extensive history of violent
criminal behavior. On May 23, 1986, appellant committed an aggravated robbery at a convenience
store and shot at a police officer to avoid getting caught. As a result of that incident, appellant was
convicted of aggravated robbery and attempted capital murder and sentenced to thirteen years in
prison. On March 24, 1991, appellant forced his way into Elbert Madden's apartment and robbed
Madden at knifepoint. On April 6, 1991, appellant stabbed Gary Stuckwisch to death and stole his
car. Two weeks later, appellant stabbed John Miller to death and subsequently used Miller's credit
card to buy cigarettes at a gas station. On May 10, 1991, appellant robbed Grady Andrews, shot him
in the mouth, beat him on the head with a gun when it would not fire a second time, and then stabbed
him in the side, cutting into his gall bladder and liver. 

 On May 16, 1991, at the age of thirty-six, appellant committed the present offense. He forced
his way into Waylon and Sheila Dockens's motel room and robbed them of money and jewelry. 
Using strips of clothing, socks, and pantyhose, appellant tied the couple's hands and ankles and
gagged them. After they were tied and gagged, appellant shot both of them. Sheila was shot in the
chest and died. Waylon was shot in the head and rendered unconscious, but survived. Waylon woke
up later to call the hotel operator for help. At the hospital, Waylon underwent a craniotomy to
remove the bullet, and was left with a small depression in his skull.

 At the 2003 punishment hearing, appellant testified. He denied murdering Stuckwisch,
Miller, and Sheila Dockens. He also denied robbing and nearly killing Andrews. 

B. Analysis


 Recently, we addressed a similar argument made by another defendant. In Bible v. State, the
defendant contended that, because he was sentenced to life without parole in a Louisiana case, he
would interact only with prison society, and the absence of a violent record during twelve years
served in prison showed that he was not a threat to prison society. (7) The defendant had an extensive
history of violent criminal behavior, including four murders and numerous sexual assaults. (8) Under
the circumstances, we found that "[t]here was ample evidence from which a rational jury could
conclude that appellant posed a future danger to society, whether inside or outside prison." (9)

 Appellant's circumstances are similar. Instead of sexual assault, appellant's motive for
murder appears to be robbery, and that motive has spurred him to a string of violent crimes. 
Appellant has killed three people and has attempted to kill three others, including a police officer. 
Appellant's assault of Andrews was particularly brutal. And appellant's shooting of Waylon and
Sheila Dockens, after they were tied and gagged, could have been considered by the jury to be
especially callous, calculated, and cold-blooded.

 We also observe that appellant cannot claim that his violence was a passing part of his youth,
as he was thirty-six years old at time of the last murder. (10) Moreover, appellant's testimony denying
involvement in the various crimes, coming during the punishment phase after he had been convicted,
could rationally be seen as showing a lack of remorse and a refusal to accept responsibility for his
actions. (11) 

 The evidence is legally sufficient to support the jury's answer to the future dangerousness
special issue. Point of error three is overruled. 

II. JURY SELECTION


A. Race-based peremptory challenges


 In points of error four and five, appellant contends that the State exercised peremptory
challenges against black veniremen in violation of Batson v. Kentucky. (12) Batson prohibits strikes 
on the basis of race. (13) There is a three-step process for evaluating a Batson claim. (14) First, the
complaining party must establish a prima facie showing of racial discrimination. (15) Second, if that
is done, the striking party must articulate a race-neutral explanation for the strike in question. (16) 
Third, once a race-neutral explanation is articulated, the burden is on the complaining party to show
that the explanation is really a pretext for discrimination. (17) 

 Appellant complains about the strikes of Foster (point of error four) and Robinson (point of
error five). He concedes that the State articulated race-neutral explanations, so only step three of the
Batson inquiry is at issue. Appellant cites a court of appeals decision, Parramore v. State, for the
proposition that "the trial judge may not . . . merely accept the prosecutor's specific reasons at face
value" in conducting a step three inquiry. (18) But at step three, the burden is on appellant to show that
the reason is merely a pretext for discrimination. (19) 

 The State's reasons for striking Foster were:

(1) In the written questionnaire, he answered the question, "What are your feelings
about the death penalty?" with, "If it can be avoided, so be it."


(2) In the written questionnaire, he answered the question, "The purpose the death
penalty serves in our society is?" with, "None."


(3) In the written questionnaire, he answered the question regarding "the best
argument for the death penalty," with, "Is it really necessary?"


(4) He appeared to be trying to avoid answering questions.


(5) He had a deferred adjudication for felony theft in 1991.


Appellant claims that a review of the record shows that there is no support for reason (4). He also
claims that Foster was a "prototypical juror" in that he was "family oriented," married for fourteen
years, had stable employment, gave thoughtful and honest answers, and said he would want to know
all the facts before making a decision.

 Even assuming that (4) was not a sufficient reason for the strike, (20) it was not an inherently
discriminatory reason, and the remaining four reasons are indisputably supported by the record. The
State's explanations are all race-neutral. Point of error four is overruled.

 The State's reasons for striking Robinson were:

(1) In the written questionnaire, she answered the question, "What are your feelings
about the death penalty?" with a statement that she felt "the death penalty gives them
a way out."


(2) In the written questionnaire, she answered the question, "Do you think that the
death penalty is used too often or too seldom?" with, "Who am I to say if someone
lives or dies?"


(3) "[L]ooking into her eyes," the prosecutor "wasn't sure that ultimately she would
be able to answer the questions" under the evidence in a way that would result in
death.


Appellant points out that Robinson gave some answers that were favorable to the State's position
and that the State challenged her for cause on bases that generally make a juror favorable to the State:
that she would automatically answer the "future dangerousness" issue "yes" and that she was unable
to distinguish between intentional and deliberate mental states. Appellant suggests that the
prosecutor's comment about "looking into her eyes" is inconsistent with answers that showed her
to be "a prototypical State's juror."

 Assuming arguendo that the third articulated reason was insufficient, the first two reasons
were nevertheless race-neutral grounds for exercising a peremptory challenge, and appellant has not
shown that those reasons were mere pretexts. He suggests that the those reasons were pretextual
because Robinson was a state-oriented juror and the State did not in fact have any rational basis for
striking her. But while Robinson did express some views favorable to the prosecution, her answers
to two of the questions on the questionnaire suggested that she might have some difficulty with the
death penalty. Point of error five is overruled. 

 B. Challenges for cause - "Deliberateness" special issue


 In points of error six through eight, appellant contends that the trial court erred in denying
challenges for cause against veniremen for expressing certain opinions associated with the
"deliberateness" special issue. (21) Appellant followed the procedure established as a prerequisite for
showing harm from the denial of challenges for cause. (22) Because he received one extra peremptory
challenge, to demonstrate harm he must show that the trial court erred in denying at least two
challenges for cause. (23)

 In point of error seven, appellant contends that prospective juror Gillespie was challengeable
for cause because "she would always find that a killing was done with the reasonable expectation
that death would occur after first finding that the conduct was done intentionally." This claim is
facially without merit. We have already held that a prospective juror is not challengeable for cause
merely for drawing the very logical conclusion that "if a person intentionally kills someone, that
person reasonably expects death to result." (24) Rather, the prospective juror is challengeable for cause
only if, as a result of finding "intentional" conduct with regard to the defendant's guilt, he would
always answer the "deliberateness" special issue affirmatively "in its entirety." (25) Nevertheless, the
portion of the voir dire upon which appellant relies appears relevant to the broader question
regarding whether the prospective juror would automatically answer "yes" to the entire special issue. 
We will address appellant's claim in that light. 

 Appellant relies upon the following portion of voir dire conducted by defense counsel:

Q. My question is: If they proved he was guilty of intentionally killing the person,
wouldn't you automatically think that was a deliberate act with the expectation that
death would result?


A. Yes.


* * *



Q. Can you imagine a situation where you were picked to serve on a jury and you
convicted somebody of intentionally committing a capital murder during the course
of a robbery by shooting somebody where you wouldn't say it was done deliberately
and with reasonable expectation that death would result?


A. No sir.


Appellant leaves out of his rendition of the colloquy the fact that Gillespie said that she might be
"confused" regarding this line of questioning. Gillespie also indicated, during voir dire conducted
by the prosecutor both before and after the above colloquy, that she could and would properly
evaluate the deliberateness special issue separately from the question of intent:

 [Before]

Q. Here at guilt, the question was intentional, having the specific intent to cause
someone's death through a robbery. Here they are asking if the death was committed
deliberately. A different word. So, they must be wanting you to ask yourselves
different things. Deliberately involves more thought process than just intentional.

 Let me give you a common, everyday kind of example. You and I are going
to drive somewhere. One of us is going to put our foot on the accelerator so the car 
move us in a certain direction. That's our intent, we do it. Yet, we come up to a red
light - or a light that's green and goes yellow and we've got to make a decision. Do
we go through it, do we stop? There is no premeditation at that moment. It's a quick
decision. Yet, there is a thought process involved. That's how it's different from
intentional. Our foot is on there, it's intentional. Here, we have to make a decision.

 See how those two things are different?


A. Right.


Q. Okay. Would you automatically say that death was committed deliberately just
because they were guilty of doing it intentionally?


A. No.


Q. Different things right?


A. Different.


 [After]

Q. You are giving different answers to [defense counsel] and I, so I want to explore
that. What you told him is that you are automatically always going to answer this
special issue yes on deliberately and with the reasonable expectation knowing that
someone had the specific intent to take someone's life during a robbery. You and I
talked about how more thought is required from intentional to deliberate. And we
talked about some of our stupid criminals and how there would be cases with no
reasonable expectation. And I want to be sure that - where you are sitting at this
point. 

 Are you telling me that - and you haven't heard the evidence, understand?


A. Right.


Q. So, what you are telling me right now is I have closed my mind, all I have to
know is a specific intent to take someone's life during the course of a robbery, that's
always yes, I don't have to hear facts.


A. No, with the facts.


Q. Okay. So if you listen to the facts and the facts tell you - you listen to it and I
don't prove beyond a reasonable doubt that the deceased was killed in a deliberate
fashion and there wasn't a reasonable expectation causing the death, would you be
able to vote no if I didn't prove that to you?


A. Sure.


Q. And that's the case even though you know the person is guilty of capital murder,
guilty of intentionally causing a person's death during a robbery? You can look at
that situation, and if the facts told you the answer to this is no, you would vote no?


A. No.


Q. If it said yes, you'd vote yes? There wouldn't be an automatic, you would have
to look at the facts and - 


A. Facts.


Q. - be able to go either way looking at the facts.


A. Yes.


 When confronted with a vacillating or confused prospective juror, we accord great deference
to the trial court's ruling. (26) Gillespie's answers were vacillating. The trial court did not abuse its
discretion in denying the defense challenge for cause. Point of error seven is overruled.

 In point of error eight, appellant contends that prospective juror Trimble was challengeable
for cause because "she indicated she would always find that the conduct of the defendant that caused
the death of the deceased was done deliberately and with the reasonable expectation that death would
occur after first finding that the conduct was done intentionally." He relies upon the following
portion of voir dire conducted by the trial court:

Q. If you found from the evidence that the person intentionally took another person's
life during the commission of a robbery, you further found it was done deliberately,
more of a thought process, then would you automatically find that there was a
reasonable expectation that the death of the deceased or another would result?


A. Yes, sir. The death of another - 


 This colloquy does not support the proposition that Trimble would always answer the
deliberateness special issue "yes" upon a finding that the conduct was done "intentionally." At best,
it supports the proposition that a finding of "intentionally" would necessarily lead to a conclusion
that there was "a reasonable expectation that the death of the deceased or another would result." As
we explained with regard to point of error seven, that proposition is not ground for a valid challenge
for cause. 

 Moreover, later in the colloquy Trimble indicated that she would not automatically reach that
conclusion: 

 [Immediately following the portion of the colloquy quoted by appellant]

Q. The deceased, the death of the deceased or another.


A. Say it again, please. I'm sorry.


Q. (By [defense counsel]) You have already found someone intentionally took the
life of another person -


A. Uh huh.


Q. - during the commission of a robbery?


A. Okay.


Q. There was some more thought process than intentionally. Then would you then
find automatically that there was a reasonable expectation that the death of the
deceased or another would result?


A. Not automatically.


Q. Not automatically?


A. No.The trial court did not abuse its discretion in denying the defense challenge for cause. Point of error
eight is overruled.

 Because we have overruled points of error seven and eight, appellant cannot show that at
least two challenges for cause were erroneously denied. Therefore, we need not address whether the
trial court erred in failing to excuse venireman Penn. Point of error six is overruled.

III. EVIDENCE


A. Extraneous offenses - sufficiency of proof for admission


 In points of error one and two, appellant contends that the trial court erred in admitting
evidence of the Stuckwisch murder at the punishment phase of trial because insufficient evidence
was introduced to show that appellant committed it. The standard for determining whether evidence
of an extraneous offense is sufficient to support its admission at the punishment phase of a capital
murder trial is "clear proof that the offense was committed and that the defendant perpetrated the
offense." (27) Applying the "clear proof" standard on review, we evaluate the trial court's ruling solely
to determine whether it was in the zone of reasonable disagreement. (28) 

 The evidence shows that Stuckwisch was stabbed to death in his apartment and his car was
stolen. A blood-covered partial palm print matching one of appellant's palms was found on one of
the walls of Stuckwisch's apartment. After Stuckwisch's car was recovered from a parking lot,
fingerprint testing revealed prints that matched appellant's left thumb and right middle finger.

 Appellant contends that this evidence is inconclusive. He points out that the latent print
examiner conceded that he could not determine whether the palm print had been on the wall prior
to blood being placed on the wall or whether it was indicative of blood being placed on the wall by
the palm. The latent print examiner further testified that the chemical used to detect the print could
react with blood or perspiration. 

 Appellant also contends the print evidence was inconclusive because he had testified at trial
that he knew Stuckwisch, had been present in Stuckwisch's home and car numerous times, and had 
fixed the brakes on Stuckwisch's car on the Monday before the murder. Appellant did not explain
how he knew Stuckwisch, and no one else testified that appellant and Stuckwisch knew each other.

 Before trial, appellant obtained a running objection to evidence of extraneous offenses,
including the Stuckwisch murder, on the ground that the evidence was insufficient to show appellant
committed the offenses. At this pretrial hearing, one of the prosecutors explained that the
Stuckwisch murder was substantiated by the palm print and the two fingerprints. Defense counsel
did not, at that time, explain that appellant would testify to knowing Stuckwisch. An appellate court
must review the trial court's ruling on the admission of evidence in light of the information before
the trial court at the time. (29) Although appellant obtained a running objection, this objection did not
alert the trial court to the possibility that the palm and finger prints could be innocuously explained 
by appellant knowing the victim. It was incumbent upon appellant to alert the trial court that the
apparent basis for the insufficiency objection had changed. Because he did not do so, he is not
entitled to have this Court consider his testimony in determining the sufficiency of the evidence to
support the extraneous offense.

 Even if we did consider his testimony, however, we would still find the evidence to be
sufficient. We have previously recognized fingerprint evidence as sufficient to connect a defendant
to an extraneous offense. (30) The evidence was not rendered inadmissible simply because appellant
offered an innocent explanation for its existence. Points of error one and two are overruled. 

 B. Prior testimony - Right to Confrontation


 In point of error nine, appellant contends that testimony of five witnesses from the prior
capital murder trial in this cause was admitted in violation of the Confrontation Clause of the Sixth
Amendment. (31) In support of his argument, he cites the "unavailability" and "similar motive"
requirements of the hearsay exception regarding former testimony. (32) He also relies upon our case
of Coffin v. State (33) and the United States Supreme Court case of Crawford v. Washington. (34) 
Although appellant cites hearsay rules, he does not argue per se that the hearsay rules were violated
but appears to be citing the rules as coextensive with the requirements of the Confrontation Clause. (35)
Assuming that the "unavailability" and "similar motive" requirements found in the rules of evidence
are also required by the Confrontation Clause, we address appellant's claims.

1. Unavailability


 He first contends that, with three of the five (36) witnesses, the State failed to satisfy the
"unavailability" requirement. In his brief, appellant does not explain why the three witnesses -
Francois, Jones, and Collins - were not "unavailable." Thus he has failed to adequately brief his
claim and presents nothing for review. (37) Even if his claim were adequately briefed, however, we
would reject it.

 The record shows that the State offered explanations of why each of these witnesses was
unavailable. Francois was in the hospital with a collapsed lung and the prognosis was grave. Jones
could not be located after an extensive search that included attempting to find her through the Board
of Nursing and through the hospital where she had worked. And Collins was the sole caregiver for
his wife, who had recently suffered a stroke. The trial court specifically ruled that all of these
witnesses were unavailable. 

 The reasons relating to Francois and Jones fall squarely within enumerated definitions of
unavailability found in Rule 804(a): Francois due to physical illness (38) and Jones because of the
State's inability to find her and thus procure her attendance. (39)

 Assuming Rule 804(a)(4) refers to the declarant's physical or mental illness or infirmity,
Collins's reason for being unavailable would not appear to fit within the confines of any of the five
definitions found within the Rule 804(a). But the rule provides, "'Unavailability as a witness'
includes situations in which the declarant" meets one of the five enumerated definitions. (40) Under
this language, the five definitions do not appear to be exhaustive. With regard to the similarly
worded federal rule, one federal district court has so held, (41) and one federal circuit court has noticed
the issue without expressing a view. (42) The federal district court opinion, Riley, has been cited
approvingly by one state supreme court, which parenthetically recognized it as citing this
proposition. (43) Of course, even if the five definitions were exclusive in the rule, the question would
still remain whether other reasons could satisfy the Confrontation Clause requirement of
unavailability, and if so, whether the reason with regard to Collins was sufficient.

 We need not decide any of these questions, but we raise them to illustrate the failure of
appellant to adequately apprise the trial court of the basis for the complaint he now urges. After the
State presented its explanation of why Collins was unavailable, the following occurred:

THE COURT: Any objection to Collins' testimony, prior testimony?


[DEFENSE COUNSEL]: Judge, we are going to make a 6th Amendment right to
confrontation objection to all of them. But that's the only objection. I don't have
specific things to complain about unfortunately.


The trial court then proceeded to ask whether the various witnesses (including the two who were
deceased) had been subject to full cross-examination at the first trial. Then the State gave its reasons
for the unavailability of Francois and Jones, after which the trial court asked appellant if he had the
same Sixth Amendment objection, and appellant replied affirmatively.

 To preserve error, a party must state his ground for objection "with sufficient specificity to
make the trial court aware of the complaint, unless the specific grounds were apparent from the
context." (44) In this case, appellant failed, with regard to all three witnesses, to make the trial court
aware that he was claiming that the State's articulated "unavailability" reasons were insufficient. 
In United States v. Gibbs, the Third Circuit held that a defense Confrontation Clause objection was
not sufficiently specific because it did not draw the trial court's attention to the unavailability issue
raised on appeal. (45) Defense counsel made a confrontation clause objection at the end of the
Government's case (46) but did not assert that the declarant "was in fact available or that the
Government had a burden of showing unavailability and had not carried this burden." (47) The Third
Circuit observed that, had defense counsel mentioned the word "availability," the Government could
have presented evidence regarding the declarant's availability or unavailability. (48) The court
concluded that "it is solely by reason of [the defendant's] failure to raise the issue of [the declarant's]
availability before the district court, that the record is barren of any evidence of [the declarant's]
unavailability." (49)

 In the present case, the State offered evidence of unavailability. This evidence was clearly
sufficient as to two out of the three witnesses from the prior trial whose testimony the State wished
to offer, and only possibly deficient as to the third. Appellant neither raised the issue of availability,
nor made any distinction whatsoever between the various witnesses for the purpose of his
Confrontation Clause objection. The trial court was not alerted to the possibility that the reason for
Collins's unavailability might differ in a material respect from the reasons given for the other
witnesses. Had appellant challenged the adequacy of the reason given for Collins's unavailability,
the State might have been able to offer additional evidence supporting a legal determination that
Collins was in fact unavailable. Under the circumstances, we find that appellant has failed to
preserve error with regard to Collins's availability.

2. Similar motive


 Appellant further contends that the State "did not attempt to show that a 'similar motive'
existed in this case" and that, under Coffin, a "similar motive" inquiry must examine "the availability
of substantial ways of challenging testimony that were not pursued by [the] examiner." (50) But the
Coffin case involved the admission at a criminal trial of prior testimony from a juvenile certification
hearing, (51) and the difference in types of proceedings raises a question about whether the defendant
had reason to develop the testimony the same way in the two different proceedings. Here, the prior
proceeding is the prior capital murder trial of this very case. The motive to cross-examine was not
merely "similar" at the prior proceeding as it was at the proceeding currently before us on appeal;
it was identical. Moreover, appellant neglects Coffin's caution that "the applicability of the
exception does not turn on whether the opponent actually availed himself of that opportunity. To
be sure, that he did not take the opportunity may be one indicator that he lacked a similar motive. 
We do not consider it, however, to be a conclusive one." (52)

 Appellant also contends that the new rule announced in Crawford "should be expanded to
prohibit the introduction of prior testimony unless it can be affirmatively shown that no other areas
of inquiry could have been advanced at the previous trial." But language in that opinion lends no
support for such an extension. According to Crawford, the Sixth Amendment is satisfied in the
testimonial context by fulfilling the twin common-law requirements of "unavailability and a prior
opportunity for cross-examination." (53) The Supreme Court has never suggested that the Sixth
Amendment permits the introduction of prior testimony only when every possible avenue of cross-examination has in fact been exhausted, and we decline appellant's invitation to formulate such a
rule. Point of error nine is overruled.

 The judgment of the trial court is affirmed.

 Keller, Presiding Judge

Date delivered: June 29, 2005

Do not publish
1. See Broxton v. State, 909 S.W.2d 912 (Tex. Crim. App. 1995).
2. Id.
3. Broxton v. Johnson, 2001 U.S. Dist. LEXIS 25715, at 13 (S.D. Tex., March 28, 2001).
4. See Art. 37.0711, §§3(b) and 3(e). All references to Articles are to the Texas Code of
Criminal Procedure unless otherwise indicated.
5. Art. 37.0711, §3(g).
6. The issue asks "whether there is a probability that the defendant would commit criminal
acts of violence that would constitute a continuing threat to society." Art. 37.0711, §3(b)(2).
7. 2005 Tex. Crim. App. LEXIS 704, 25 (May 4, 2005).
8. Id. at 26-27.
9. Id. at 28.
10. See Wilson v. State, 7 S.W.3d 136, 143 (Tex. Crim. App. 1999).
11. Ford v. State, 919 S.W.2d 107, 111-112 (Tex. Crim. App. 1996).
12. 476 U.S. 79 (1986).
13. Id.
14. Mathis v. State, 67 S.W.3d 918, 924 (Tex. Crim. App. 2002).
15. Id.
16. Id.
17. Id.
18. 853 S.W.2d 741, 744 (Tex. App.-Corpus Christi 1993, pet. ref'd).
19. Mathis, 67 S.W.3d at 924.
20. But see Gibson v. State, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)(race-neutral
reason for challenge not a pretext if prosecutor genuinely believed that venireman possessed the
characteristic in question, even though that belief turns out to be erroneous).
21. The issue asks "whether the conduct of the defendant that caused the death of the
deceased was committed deliberately and with the reasonable expectation that the death of the
deceased or another would result." Art. 37.0711, §3(b)(1).
22. See Sells v. State, 121 S.W.3d 748, 758 (Tex. Crim. App.), cert. denied, 540 U.S. 986
(2003).
23. Id.
24. Garcia v. State, 887 S.W.2d 846, 855 (Tex. Crim. App. 1994), cert. denied, 514 U.S.
1005 (1995).
25. Id.
26. Garcia v. State, 919 S.W.2d 370, 401-402 (Tex. Crim. App. 1996), cert. denied, 125 S.
Ct. 267 (2004).
27. Chamberlain v. State, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999), cert. denied, 528
U.S. 1082 (2000).
28. Id.
29. Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).
30. Harris v. State, 827 S.W.2d 949, 961 (Tex. Crim. App.), cert. denied, 506 U.S. 942
(1992).
31. U.S. Const., Amend. VI: "In all prosecutions, the accused shall enjoy the right . . . to
be confronted with the witnesses against him."
32. See Tex. R. Evid. 804(a), (b)(1). 
33. 885 S.W.2d 140 (Tex. Crim. App. 1994).
34. 541 U.S. 36 (2004).
35. Appellant did not lodge a hearsay objection at trial. 
36. He concedes that two of the witnesses, Franklin and Andrews, were unavailable
because they were dead.
37. Tex. R. App. P. 38.1(h)("The brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and the record").
38. See Tex. R. Evid. 804(a)(4).
39. See Tex. R. Evid. 804(a)(5).
40. Tex. R. Evid. 804(a)(emphasis added).
41. Govt. of Virgin Islands v. Riley, 754 F. Supp. 61, 64 (D.V.I. 1991), aff'd, 973 F.2d 224
(3rd Cir. 1992)("The literal language of Rule 804(a) suggests that the definition of unavailability
is illustrative rather than exhaustive").
42. United States v. Acosta, 769 F.2d 721, 723 n. 5 (11th Cir. 1985).
43. State v. Townsend, 635 So. 2d 949, 955 (Fla. 1994).
44. Tex. R. App. P. 33.1(a)(1)(A).
45. 739 F.2d 838, 848 (3rd Cir. 1984), cert. denied, 469 U.S. 1106 (1985); see also United
States v. Rousseau, 21 M.J. 960, 967 (A.C.M.R. 1986), aff'd, 25 M.J. 188 (C.M.A.
1987)(discussing Gibbs). 
46. Id. After finding that the objection lacked specificity, the court went on to find the 
objection to be untimely, as well. Id. at 849.
47. Id. at 848.
48. Id.
49. Id.
50. See Coffin, 885 S.W.2d at 149.
51. Id. at 147-148.
52. Id. at 149 (emphasis added).
53. 541 U.S. at 68.